UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
                                                :

**UNITED STATES OF AMERICA,**                        :

                                 **Plaintiff,**                 :

                                                :          08 Cr. 360 (HB)

                         - against -                    :

                                                :          **OPINION & ORDER**

**ANTONIO SCOTT and O'KENE WHITE,**      :

                                 **Defendants.**              :

------------------------------------------------------------------x

**Hon. HAROLD BAER, JR., District Judge:**

      Defendants Antonio Scott ("Scott") and O'Kene White ("White") move to suppress statements that they made to New York City Police Department ("NYPD") Detectives after they were given full *Miranda*[1] warnings. Scott and White also move to sever their trial and to dismiss their indictment for lack of jurisdiction. On September 3, 2008, this Court held a suppression hearing and heard oral argument on Defendants' motions. Separately, White has made several motions seeking the disclosure of various portions of the Grand Jury proceedings. For the reasons set forth below, except for Defendant White's motion to suppress his written statement, Defendants' motions are denied.

## I. BACKGROUND

      Scott and White are each charged in an indictment filed April 23, 2008 with Conspiracy to Commit a Hobbs Act violation, Attempted Hobbs Act violation and Use of a Firearm in Connection with a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii) & (iii) and 18 U.S.C. § 2. Scott is also charged with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). On September 2, 2008, a Grand Jury returned a five-count superseding indictment. In addition to the charges in the previous indictment, the superseding indictment charges Scott and White with one count of attempted possession with intent to distribute marijuana, in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2. Additionally, Count Four, which charges both Defendants with violating 18 U.S.C. § 924(c), was amended to refer to both the robbery and narcotics counts.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 467-73 (1966).

1

## II. DISCUSSION

### A. Motions to Suppress

Scott and White were arrested the night of March 6, 2008 in connection with a home-invasion robbery. Early on March 7, 2008, at the 47th precinct in the Bronx, Scott and White were read their *Miranda* rights by NYPD Detectives. Defendants move to suppress the Government's use of statements that Defendants subsequently gave to NYPD Detectives. Of the three statements that are at issue here, the Government intends to use only White's written statement on its case in chief. The Government intends to use White's oral statement only to impeach White if he takes the stand and similarly Scott's written statement only for impeachment purposes if he takes the stand at trial.

#### 1. *Defendant White's Written Statement—Case in Chief*

At the suppression hearing, NYPD Detective Joseph Sikorski testified that he advised White of his *Miranda* rights at approximately 1:25 a.m. on March 7, 2008. Tr. 12:22-24. He gave White a form that listed his rights, read them to White and asked White if he understood each one. Tr. 11:12-14; *see* Gov't's Ex. W-1. White responded both orally and by writing "yes" on the form that he understood each right. Tr. 20:2-8, 20:23-24; *see* Gov't's Ex. W-1. Detective Sikorski further testified that when he read the last question, "[n]ow that I have advised you of your rights, are you willing to answer questions," White orally agreed to answer questions, then "went over briefly orally" and wrote and signed "a statement on his conduct of that day." Tr. 14:19-24; 15:7-10; 29:13-15. However, on the form itself, in response to whether he was willing to answer questions, White wrote "no" and signed his initials. Gov't's Ex. W-1.

White's signed, handwritten statement reads:

> On 3-6-08 we enter the apartment at about 8:20 pm all I do was tie the kids up for there safety and kept them inside the kitchen where I was with them for the whole time I was there. The other was inside the room. We got arrested about maybe 8:30 pm – 8:40 pm. I am not sure what time it was to be exact. It was at 655 East 23 Street first floor.

Gov't's Ex. W-2.

White argues that his written statement should be suppressed because White had, minutes earlier, written on his *Miranda* form that he was unwilling to answer questions. The Government argues that White waived his *Miranda* rights.

Statements made by a defendant during the course of custodial interrogation are inadmissible in the prosecution's case in chief absent the defendant's waiver of the rights specified in *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). Having been advised of his *Miranda*

2

rights, a suspect may waive those rights and agree to be interviewed. Any statements made after such a waiver are admissible. The Government must carry its burden of proving, by a preponderance of the evidence, that the waiver was voluntary and that the defendant was aware of his right being waived and the consequences of waiving that right. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995); *United States v. Bye*, 919 F.2d 6, 8-9 (2d Cir. 1990).

Detective Sikorski's testimony is the only evidence of waiver. He testified that White told him orally that he would answer questions and then gave an oral statement, which the Detective had him write down. *See* Tr. 15:14-16. Detective Sikorski said that at no time did White orally indicate in any way that he did not wish to answer questions. Tr. 15:17-19. There is no reason to doubt the credibility of Detective Sikorski's testimony. Indeed, when questioned by the Court, Detective Sikorski testified that if it had been clear that White was unwilling to answer questions, he would not have continued to ask White for a statement. Tr. 27:19-25. White did not take the stand during the suppression hearing to explain his side of the story.

Nevertheless, it is troubling that Detective Sikorski failed to read the "no" that White wrote on his *Miranda* form. Detective Sikorski failed to make sure that White wrote "yes" to indicate that he was willing to answer questions. Instead, the Detective "just looked and [White] put something down. I didn't look at yes or no, I looked at what he wrote down, again upside down, and I was – again, I didn't get a clear look at it." Tr. 21:2-6. However, Detective Sikorski also testified that "[a]fter I finished reading his rights I got the paper in my hand, I pulled the paper towards me . . . ." Tr. 26:13-16. At this time, he could have read White's written answers clearly but did not do so.

White wrote "no" on the form, to show that he was unwilling to answer questions, virtually at the same time that he was saying "yes" to the Detective. White's written "no" is strong evidence that, if he made any oral communication to the contrary, he was not aware of his right being waived and the consequences of waiving that right. Put another way, writing "no" and saying "yes" do not add up to a *knowing* waiver of his *Miranda* rights.

Moreover, this is not a case where a suspect initially indicates that he is unwilling to answer questions and then some time later volunteers a statement. Here, White began writing his statement at 1:30 a.m., only five minutes after the Detective read him his rights. Gov't's Ex. W-2; Tr. 21:7-11. It is hard to believe that White would have changed his mind so quickly.

Therefore, the Government has not proved a waiver by a preponderance of the evidence

3

and may not use White's written statement in its case in chief.

The Government may, however, use White's statement to impeach White's credibility if he takes the stand. For a statement to be admissible for impeachment, the defendant must have given the statement voluntarily and without coercion. *Oregon v. Hass*, 420 U.S. 714, 722-24 (1975) (hereinafter, *Hass*); *Mincey v. Arizona*, 437 U.S. 385, 399-402 (1978); *Parsad v. Greiner*, 337 F.3d 175, 184 (2d Cir. 2003). The Supreme Court explained in *Harris v. New York*, 401 U.S. 222, 224 (1971), that "[i]t does not follow from *Miranda* that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards." The Court reasoned that "[a]ssuming that the exclusionary rule has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief," *id.* at 225, and that the "shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." *Id.* at 226, quoted in *Hass*, 420 U.S. at 721-22.

Thus, even if a statement is not admissible in the prosecution's case in chief because it was taken in violation of *Miranda*, the Government may use it to impeach the defendant's credibility should he take the stand at trial, so long as the statement was voluntary and uncoerced. Involuntariness or coercion may be shown by the defendant's characteristics at the time of the statement, the conditions of the interrogation and the conduct of the police.

Here, there is no evidence that White gave his statement involuntarily or that it was the result of coercion. There is no evidence that Detective Sikorski, or anyone else, made any threats or promises to White to induce him to make the statement. *See* Tr. 21:25-22:5. Detective Sikorski found White's demeanor to be "very calm, just actually very cooperative." Tr. 22:7. In his affidavit, White's assertion that his statements were "not voluntary and the result of illegal police conduct and activity" is merely conclusory. White Aff. ¶¶ 3-4 (July 14, 2008).

White's motion to suppress his written statement from the Government's case in chief is granted, but the Government may use the statement to impeach White's credibility.

2.  *Defendant White's Oral Statement—Impeachment Purposes Only*

The Government intends to use a later oral statement given by White to Detective Manuel Madera only for impeachment purposes should White take the stand at trial. Detective Madera testified that he spoke with Detective Sikorski, who told him that White had been read and understood his *Miranda* rights, that White was willing to answer questions and that he had given

4

a written statement. Tr. 32:20-33:4. Detective Madera interviewed White at the 47th precinct during the morning of March 7, 2008. Tr. 33:8-9. He recalls asking White if he had been advised of his *Miranda* rights and also thinks that he read White his *Miranda* rights again. Tr. 33:20-25. Detective Madera testified that he asked White if he was willing to answer questions and that White responded that he was. Tr. 34:1-4. The Detective asked what had happened earlier that night, and White told him what transpired after he walked in front of the building where the robbery took place. Detective Madera recalled that White told him that

> he saw some friends that he used to play ball with. They told him to come inside the building with them. He walked into the building, and before he knew it they were going into an apartment, people were screaming. He also went in. He also stated that he helped tie down the little kids and he was also calming them down at the same time telling them nothing is going to happen to you. He realized that everybody else had a mask on so he put on a scarf around his face, and then after that he ran out.

Tr. 34: 14-23. This is only how Detective Madera recalls White's oral statement; he did not take any notes on White's oral statement. Tr. 36:3; *see* Gov't's Ex. W-3.

White argues that the Government should not be permitted to use his oral statement at trial, even if only for impeachment purposes. The legal standard that governs the admissibility of a statement for impeachment is set forth above.

Here, there is no evidence that White's oral statement was obtained by "'techniques and methods offensive to due process' or under circumstances in which the suspect clearly had no opportunity to exercise 'a free and unconstrained will.'" *See Oregon v. Elstad*, 470 U.S. 298, 304 (1985) (quoting *Haynes v. Washington*, 373 U.S. 503, 515 (1963)). There is no evidence that the police pressured White to give his statement, that the statement was obtained by means of violence, or that "there was a credible threat of physical violence." *See, e.g.*, *Arizona v. Fulminante*, 499 U.S. 279, 287-88 (1991); *Beecher v. Alabama*, 389 U.S. 35, 36 (1967); *Payne v. Arkansas*, 356 U.S. 560, 564-65 (1958); *Brown v. Mississippi*, 297 U.S. 278, 281-82 (1936). Nor was White deprived of his basic needs or subjected to lengthy interrogation such that he was unable to make a free choice. *See, e.g.*, *Malinski v. New York*, 324 U.S. 401, 403, 406-07 (1945); *Reck v. Pate*, 367 U.S. 433, 441 (1961); *Brooks v. Florida*, 389 U.S. 413, 414-15 (1967).

Detective Madera testified that he did not make any threats or promises to White during his interview and was not aware of anyone making threats or promises to White to induce him to make a statement. Tr. 37:8-15. He spoke with White in an interview room, not a jail cell. Tr. 38:9-10. The interview took place for a reasonable fifty minutes, from approximately 11:30 a.m.

5

to 12:20 p.m. on March 7, 2008. Tr. 39:3-11. White's contention in his affidavit that his statements were the "result of illegal police conduct and activity" does not show, in the absence of detailed allegations or evidence, that White's oral statement was involuntary or coerced and it may be used for impeachment only.

Therefore, White's motion to suppress his oral statement is denied.

### *3. Scott's Written Statement—Impeachment Purposes Only*

The Government intends to use a written statement by Defendant Scott only for impeachment purposes should Scott take the stand at trial. Like White's oral statement, Scott's written statement is admissible to impeach his credibility so long as Scott gave it voluntarily and without coercion.

NYPD Detective Colin Belle met with Scott in an interview room at the 47th precinct at approximately 11:30 p.m. on March 6, 2008. Tr. 43:13-19. Using the same form that Detective Sikorski had used with White, Detective Belle read to Scott his *Miranda* rights. *See* Gov't's Ex. S-1. However, unlike White, Scott did not fill out the form by writing "yes" or "no"; Detective Belle wrote Scott's answers as Scott told them to him. Tr. 44:19-22. When Detective Belle asked Scott whether he was willing to answer questions, Scott answered "No, I'm not interested," and the Detective wrote "no" on the form. Tr. 45:19-23; Gov't's Ex. S-1. At that point, Detective Belle left the interview room. Tr. 45:24-25.

The next day, Detective Madera interviewed Scott shortly after 12:20 p.m., once he had finished interviewing White. Tr. 53:14-15. After confirming with Scott that Scott's rights had been read to him and that Scott understood them, Detective Madera asked Scott if he was willing to speak. He testified that Scott agreed to talk and orally described what had happened the previous night. Tr. 54:23-55:18. When the Detective asked Scott to write down his statement, Scott said that his hand was bothering him a little, so Detective Madera wrote the statement for him. Tr. 56:1-4. Detective Madera would write a paragraph as Scott was speaking, then repeat it back to Scott, "so he wouldn't think I was adding or taking anything away from the story. And he agreed to everything all the way down to the bottom." Tr. 66:7-12. Scott signed the statement, which reads:

> Dread approached me on 3/6/08 around 6:30 pm. They told me that this guy "black" owed me some money, I was told all you got to do is stand up and watch out. Dred was underneath the steps. The lady came in then he grabbed her then he put her face down on floor then two other guys come in from outside ("shortman") and (T) entered apartment and grabbed girl. Don't know who fired gun. Dread tide up the kids and grandma. Dread come saying and asking

> "Wheres the money that your son got for me." Grandma said he moved it, its not there. Dread said wheres the food "weed," Grandma stated that he moved it. Police come in. Me and Dread ran up the stairs, went towards the roof and Dread gave me a gun to run with as soon as I got up to the roof. I took my blk hoody and the gun and threw it don't know where it landed.

Gov't's Ex. S-2; *see* Tr. 56:24-25.

Scott argues that the Government should not be permitted to use his written statement at trial, even if only for impeachment purposes, because he was coerced. The legal standard is outlined above. The grounds for Scott's contention are that NYPD officers jumped on him and injured him during his arrest and that he was held in a cell overnight, in pain, before Detective Madera questioned him.

While it is clear that Scott was mildly injured during his arrest, this does not show that the NYPD coerced Scott into giving his statement or that he gave it involuntarily. On the contrary, Scott's characteristics at the time of the statement, the conditions of the interrogation and the conduct of the police show no evidence of coercion or involuntariness.

When Detective Belle read Scott his *Miranda* rights at the precinct shortly after his arrest, Scott's physical condition was "pretty normal," except for bruises and blood on Scott's face. Tr. 47:2-8, 48:2-5. Detective Madera also testified that Scott had bruises and blood from scrapes on his face and that he appeared to be somewhat in pain. Tr. 64:12-14, 66:3-4. Scott told Detective Madera that he could not write because his hand hurt, and Scott "was moving his hand back and forth, like flexing it back and forth." Detective Madera testified that Scott appeared to be "a little bit" in discomfort, "but not too much." Tr. 64:21-24, 65:6-7, 65:8-10. Scott "said his hand was kind of hurt during the arrest," when, he claims, all the officers jumped on him. Tr. 58:10-11, 59:13-14, 65:17-24. Detective Madera, who was not present on the roof where Scott was arrested, did not know whether there was a "struggle," or how many officers were involved, although he thought there were "several." Tr. 58:10-11, 65:17-24.

The photos taken of Scott at the precinct show several cuts or scrapes on his face and what appear to be blood and a scrape on his right hand. Gov't's Ex. S-3. There is no evidence, however, aside from Scott's allegations, that the police caused these injuries. The Government proffers that Scott resisted arrest and that "the few minor injuries he has are consistent with him refusing to put his hands out when the officers were cuffing him. He got scraped up on the rough surface of the roof," where the arrest took place. Tr. 77:8-12.

While I find the sequence of the police activity troubling, the fact is Scott never complained to Detective Belle or Detective Madera about any mistreatment at the precinct, and

neither Detective testified to being aware of Scott having made any complaints to anyone else with respect to his treatment. Tr. 48:6-8; 52:1-2, 52:3-6, 58:4-7. There is also no evidence that Scott requested medical assistance during the twelve to thirteen hours that he was in a jail cell prior to his interview with Detective Madera. *See* Tr. 79:9-13. No police report reflects that anything out of the ordinary occurred during that time period. *See* Tr. 79:22-24. Scott did not ask Detective Madera to get medical treatment for him. Tr. 59:10-11.

Not surprisingly, while Scott's demeanor was "a little apprehensive," neither Detective Belle nor Detective Madera testified to any threats or promises made to Scott, and neither Detective was aware of anyone else making any threats or promises to Scott. Tr. 51:15-22, 55:21, 57:21-58:3. Scott has not alleged that any Detective made any specific threats or promises to him in connection with his statement.

The Government argues persuasively that "[i]f the theory is Mr. Scott was beaten at the time of his arrest and he was so scared that he felt he would have to make a statement, that would have happened when Detective Belle interviewed him, not several hours later when Detective Madera interviewed him." Tr. 77:2-7. Even if the arresting officers had caused Scott's scrapes and bruises and hurt his hand, there is no evidence that this incident coerced Scott into making his statement some thirteen hours later, or that Scott's discomfort caused him to make his statement against his will.

> Scott's defense counsel argues that when Scott was
> 
> brought back into the interview room again, he's complaining of injuries, Detective Madera observes the bruises, sees that Mr. Scott is in discomfort, sees he's in pain, indicative of the fact he couldn't even write, doesn't change his mind about right to counsel, he starts to be questioned. At that point his will has been broken down by the twelve to thirteen hours in custody and the statement is obtained.

Tr. 78:2-9.

However, the mere fact that Scott was held in custody overnight does not show that his statement was involuntary or coerced. He never requested medical assistance, he told Detective Madera that he was willing to give a statement, and then he did give and sign a statement. Therefore, in the absence of more conclusive evidence that Scott's statement was coerced or involuntary, Scott's motion must be denied.

## B.     Motions to Sever

White and Scott each argues that, at a joint trial, his codefendant's statements will incriminate him in violation of the Confrontation Clause of the Sixth Amendment.

8

### 1. *Arguments*

White argues that the trial should be severed because Scott's written statement, quoted above, refers to White's nickname, "Dread," and thus, assuming that Scott will not testify, admission of the statement will violate White's right to confront the witnesses against him. The Government, however, intends to introduce Scott's statement only for impeachment purposes, *i.e.*, only if Scott testifies, and this, therefore, obviates the Confrontation Clause problem, since White would be able to cross-examine Scott. Nevertheless, the Government proposes to redact Scott's statement to replace each reference to "Dread" with "another guy" or "the guy," and in an abundance of caution should do so. *See* Gov't's Br. Ex. F.

White also argues that the trial should be severed because the introduction of a pre-*Miranda* oral statement by Scott will incriminate White. Scott made this oral statement to police on the roof shortly before his arrest. He pointed to White, who was also on the roof, and said, "He did it. He was holding me hostage." The Government proposes to use this statement in its case in chief against Scott, as a spontaneous utterance and false exculpatory statement, without mentioning that Scott was pointing to White, and redacting the statement to say, "Another guy did it. He was holding me hostage."

Scott argues that the trial should be severed because White's written and oral statements, which are quoted above, will incriminate him. Neither of these statements refers to Scott by name, but uses only generic pronouns such as "we," "other," "they" and "everybody else." Therefore, the Government argues that White's statements are admissible without redaction.

In short, the Government argues that a joint trial will comply with Supreme Court and Second Circuit precedent so long as (1) the Government redacts Scott's statement to replace White's name with a neutral pronoun, (2) the Government uses each statement only against the declarant to show the declarant's guilt, and (3) the jury is instructed not to consider the declarant's statement as evidence of his codefendant's guilt.

### 2. *Analysis*

The case law on this topic is well-developed and balances an array of policy considerations. Although in *Bruton v. United States*, 391 U.S. 123, 137 (1968), the Supreme Court held that a defendant's Sixth Amendment rights were violated where his codefendant's statement was admitted, subsequent case law suggests that the Government's approach in this case complies with the Sixth Amendment.

For example, the Supreme Court in *Richardson v. Marsh*, 481 U.S. 200 (1987), held that

a codefendant's confession that was redacted to remove any reference to the other codefendant was admissible because it was not "incriminating on its face" and did not "expressly implicate" the other codefendant, even though the statement "became" incriminating when linked with evidence introduced later at trial. *Id.* at 208. The *Richardson* Court held that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Id.* at 211.

In *Gray v. Maryland*, 523 U.S. 185 (1998), the Court went further to suggest that replacing a codefendant's name with a neutral pronoun, such as in "me and a few other guys" (as a replacement for "me, [codefendant] and a few other guys"), would avoid a Confrontation Clause violation. *Id.* at 196. The Second Circuit and this district have consistently taken this approach to permit redacted statements that replace the codefendant's name with "another person" or other neutral pronoun at a joint trial. *See United States v. Williams*, 936 F.2d 698, 700 (2d Cir. 1991); *United States v. Alvarado*, 882 F.2d 645, 652 (2d Cir. 1989), *overruled on other grounds, Bailey v. United States,* 516 U.S. 137 (1995); *United States v. Tutino*, 883 F.2d 1125, 1135 (2d Cir. 1989); *United States v. Martinez-Montilla*, 135 F. Supp. 2d 422, 424-25 (S.D.N.Y. 2001).

Defendants rely on *Crawford v. Washington*, 124 S. Ct. 1354 (2004), in which the Supreme Court held that out-of-court testimonial statements by witnesses are barred under the Confrontation Clause, unless witnesses are unavailable and the defendants had the prior opportunity to cross-examine them, regardless of whether the court considers such statements to be reliable. Defendants argue that *Crawford* limited the holdings of *Richardson*, *Gray* and their progeny and so a codefendant's statement that incriminates the other codefendant is no longer permitted even if redacted. The Court in *Crawford*, however, did no such thing and called this issue an "entirely different question." *Id.* at 1369. Moreover, the Second Circuit in *United States v. Lung Fong Chen*, 393 F.3d 139 (2d Cir. 2004), expressly held that in its view *Crawford* did not overrule Supreme Court precedent and that the admission of a codefendant's statement remains admissible so long as the other codefendant's name is redacted. *Id.* at 150.

Here, as explained above, Scott's written statement presents no Confrontation Clause problem for White because the Government will introduce it only if Scott takes the stand. Scott's oral statement to police on the roof will not run afoul of the well-settled case law so long as the Government redacts the statement as it proposes. White's statements present no

Confrontation Clause problem for Scott because they use only neutral pronouns and do not, on their own, suggest that they refer to Scott. The Court will present a limiting instruction to the jury to the effect that they must consider each declarant's statements as evidence of only his own guilt. Therefore, Defendants' motions to sever the trial are denied.

**C.      Motions to Dismiss for Lack of Federal Jurisdiction**

Defendants argue that the case should be dismissed because this Court lacks federal jurisdiction. Scott and White were indicted for robbery in violation of the Hobbs Act, a federal statute. *See* 18 U.S.C. § 924(c)(1)(A)(ii) & (iii). It is well settled that "an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974).

Defendants, however, argue that the case should be dismissed because the Government has failed to provide any facts to show how the robbery affected interstate commerce. The Government does not carry that burden at this stage, however. The Second Circuit has "*never* held that an indictment alleging a violation of the Hobbs Act must specify the precise nature of the effect on interstate commerce that the government intends to prove at trial." *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) (emphasis added). In *Alfonso*, the indictment, which charged the defendants with Hobbs Act robbery, did not specify how the conspiracy affected interstate commerce, and instead alleged only in conclusory terms, as here, that it did. *Id.* In denying the defendant's motion to dismiss in that case, the Circuit reasoned that

> the requirement of an effect on interstate commerce is itself an element of the offense charged, and the determination of whether the jurisdictional element has been satisfied is part and parcel of the inquiry into the 'general issue' of whether the statute has been violated. For this reason, ordinarily a challenge to the sufficiency of the evidence satisfying the jurisdictional element of the Hobbs Act is not appropriately decided on a motion to dismiss.

*Id.* at 777.

Finally, the Court distinguished *United States v. Mennuti*, 639 F.2d 107 (2d Cir. 1981), because "in that case the government had filed an affidavit making a full proffer of the evidence to be presented at trial." 143 F.3d at 777 (citing 639 F.2d at 108 & n. 1). Only in such a narrow circumstance, which does not exist here, may the court make a pretrial determination as to whether the evidence is sufficient to show an effect on interstate commerce. Therefore, Defendants' motions to dismiss are denied.

### D. White's Motions Concerning the Grand Jury Process

White has made several motions seeking the disclosure of various elements involved in the Grand Jury proceedings. First, he moves for an order compelling the Government to affirm or deny the use of summaries of testimony or documents before the Grand Jury. He argues that the prosecutor presented to the Grand Jury only a summary of the police report, which reported that the victims could not see the perpetrators because the men wore masks. White asserts that the police report itself must not have been presented to the Grand Jury, or else the Grand Jury would not have entered an indictment.

Second, White moves to inspect the names of the "qualified grand jurors who concurred in the indictment." He bases his motion on Fed. R. Crim. P. 6(b)(2), which provides that a defendant may move to dismiss an indictment based on an objection to the Grand Jury or an individual juror's lack of legal qualification.

Third, White moves for an order directing the disclosure of all dates on which the Grand Jury considered any evidence related in any way to his case, including transcripts of any sessions where jurors were given the opportunity to review the transcripts of previous testimony. He suggests that such disclosure would reveal that the prosecution presented "excessive hearsay" to jurors and that only NYPD officers testified and not any of the victims. White also suggests by his case citations that the Grand Jury might not have been afforded sufficient time to investigate.

These three motions are based on White's speculation that some impropriety may have occurred before the Grand Jury. A grand jury's actions are presumed valid. *See Hamling*, 418 U.S. at 139 n.23. The fundamental presumptions of grand jury secrecy and regularity are embodied in Fed. R. Crim. P. 6(e). Pursuant to that rule, a party seeking disclosure of grand jury material must make "a strong showing of particularized need" for the material sought. *United States v. Sells Engineering, Inc.*, 463 U.S. 418, 443 (1983); *see also Dennis v. United States*, 384 U.S. 855, 870 (1966). Mere "[s]peculation and surmise as to what occurred before the grand jury are not sufficient to overcome this presumption" of regularity. *United States vv. Jailall*, No. 00 Cr. 069, 2000 WL 1368055, at *2 (S.D.N.Y. Sept. 20, 2000) (internal quotations omitted).

Here, the Government is correct that White offers no evidence or factual allegations of any impropriety. This district has held that "[a]llegations based on belief, such as Defendants' allegations here, provide no reason to disregard the presumption of regularity of grand jury proceedings, and do not even warrant an *in camera* review of the grand jury minutes." *United*

*States v. Tochelmann*, No. 98 Cr. 1276, 1999 WL 294992, at *2 (S.D.N.Y. May 11, 1999) (internal quotations omitted).

Further, White's argument that hearsay was presented to the Grand Jury is unavailing. Unless "the Government misleads the grand jury into thinking it is receiving firsthand testimony when it is in fact receiving hearsay" or "there is a high probability that the defendant would not have been indicted had only nonhearsay evidence been used," "[i]t is entirely permissible for the government to use hearsay evidence in its presentation to the grand jury." *United States v. Ruggiero*, 934 F.2d 440, 447 (2d Cir. 1991).

Therefore, I will not order the disclosure of Grand Jury proceedings, and White's motion in this respect is denied.

Finally, White requests DNA results pursuant to Fed. R. Crim. P. 16(a)(1).[2] The Government is required to disclose to a defendant results or reports of scientific tests that are material to the defense and are known, or could be discovered through due diligence, by the government. *See* Fed. R. Crim. P. 16(a)(1)(F); *see also U.S. v. Salameh*, 152 F.3d 88, 130 (2d Cir. 1998). In its September 9, 2008 letter brief, the Government does not address White's request for DNA results. This Court assumes, and orders, that the Government will comply with its obligations pursuant to Fed. R. Crim. P. 16(a)(1) and disclose to both White and Scott all results of scientific tests, including DNA tests.

## III. CONCLUSION

For the reasons stated, White's motion to suppress his written statement is GRANTED, but the Government may use the statement for impeachment if White takes the stand. All other of the Defendants' motions are DENIED, but the Government must disclose to Defendants all results or reports of any scientific tests that are material to the defense and are known, or could be discovered through due diligence, including DNA tests. All such test results, along with all 3500 material, will be produced not less than a week before trial.

The Clerk of the Court is instructed to close these motions.

**IT IS SO ORDERED.**
New York, New York
September 10, 2008

_____
U.S.D.J.

---

[2] White cites Fed. R. Crim. P. 16(a)(1)(D), which concerns the defendant's prior record and is not relevant to DNA tests. This Court assumes White intended to cite Rule 16(a)(1)(F), which concerns reports of examinations and tests.