```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
                                                                  :
UNITED STATES OF AMERICA,                                         :
                                                                  :
                           Plaintiff,                             :
                                                                  :      08 Cr. 360 (HB)
              - against -                                         :
                                                                  :      OPINION & ORDER
ANTONIO SCOTT and O'KENE WHITE,                                   :
                                                                  :
                           Defendants.                            :
                                                                  :
------------------------------------------------------------------x
```

**Hon. HAROLD BAER, JR., District Judge:**

On October 21, 2008, a jury rendered a verdict that found Defendants Antonio Scott ("Scott") and O'Kene White ("White") guilty of robbery conspiracy, attempted robbery, attempted possession of marijuana with attempt to distribute, and using or carrying a firearm during and in relation to, and possessing a firearm in furtherance of, a crime of violence or narcotics trafficking crime. Scott moves for a judgment of acquittal pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure ("Fed. R. Crim. P."). White moves for a judgment of acquittal pursuant to Rule 29(c) or, in the alternative, for a new trial pursuant to Fed. R. Crim. P. 33(b)(2). For the reasons set forth below, Scott's and White's motions are denied.

## I. BACKGROUND

The reader's familiarity with the underlying facts of this case is assumed.[1] On September 2, 2008, a Grand Jury returned a five-count superseding indictment against Scott and White.[2] The superseding indictment charged Scott and White with: conspiracy to commit a Hobbs Act robbery in violation of 18 U.S.C. § 1951(b)(1) (Count 1); attempted Hobbs Act robbery in violation of 18 U.S.C. § 1951(b)(1) (Count 2); attempted possession with intent to distribute marijuana in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2 (Count 3); and using or carrying a firearm during and in relation to, and possessing a firearm in furtherance of, the offenses charged in Counts 1, 2 and 3 in violation of 18 U.S.C. § 924(c)(1)(A)(ii) & (iii) and 18 U.S.C. § 2 (Count 4).[3]

---

[1] *See United States v. White*, No. 08 Cr. 360, 2008 WL 4344530 (S.D.N.Y. Sept. 16, 2008).
[2] The original indictment, filed April 23, 2008, did not include the charge of attempted possession with intent to distribute marijuana, *i.e.*, Count 3 of the superseding indictment.
[3] The indictment also charged Scott with being a felon in possession of a firearm, in violation of 18

1

The trial took place on October 14, 15, 17 and 20, 2008, with the jury retiring to deliberate during the afternoon of October 20.  At the end of the day on October 21, 2008, the jury returned guilty verdicts against Scott and White on all four counts.

## II.  LEGAL STANDARDS

### A.   Rule 29

Fed. R. Crim. P. 29(c) permits a district court, in certain circumstances, to set aside a guilty verdict and enter an acquittal upon the defendant's motion.  "[T]he court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."  *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (internal citation and quotation omitted).  The court must not disturb the jury's verdict if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

In *Jackson*, the Supreme Court articulated that

> [t]his familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.

*Id.* (emphasis in original).

The Second Circuit has consistently held that the court must "review challenges to the sufficiency of the evidence underlying a criminal conviction 'in the light most favorable to the government,' crediting 'every inference that could have been drawn in its favor.'"  *United States v. Downing*, 297 F.3d 52, 56 (2d Cir. 2002) (quoting *United States v. Diaz,* 176 F.3d 52, 89 (2d Cir.), *cert. denied*, 528 U.S. 875 (1999)); *see also United States v. Walker*, 191 F.3d 326, 333 (2d Cir. 1999).  The court must "review the evidence as a whole . . . and 'resolv[e] all issues of credibility in the government's favor.'"  *Downing*, 297 F.3d at 56 (quoting *United States v. Abelis,* 146 F.3d 73, 80 (2d Cir.), *cert. denied*, 525 U.S. 1009 (1998), and citing *United States v. Desimone,* 119 F.3d 217, 223 (2d Cir.), *cert. denied*, 525 U.S. 874 (1998)).

### B.   Rule 33

Fed. R. Crim. P. 33 permits the district court to grant a defendant's motion for a new trial "if the interest of justice so requires."  The standard applicable to a motion for a new trial is

---

U.S.C. § 922(g)(1) (Count 5), but the Government dismissed this charge prior to trial.

"strict." *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995).  While the district court has "broad discretion" to decide a Rule 33 motion, *see id.*, "[g]enerally, a motion for a new trial should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice," *United States v. Triumph Capital Group, Inc.*, 544 F.3d 149, 159 (2d Cir. 2008) (quotation marks and citations omitted).  Unlike a motion for a judgment of acquittal, a motion for a new trial permits the court to weigh the evidence and evaluate the credibility of witnesses.  *See id.*  However, in so doing, the court "must strike a balance between weighing the evidence and credibility of witnesses and not 'wholly usurp[ing]' the role of the jury."  *Id.* (quoting *United States v. Ferguson,* 246 F.3d 129, 133 (2d Cir. 2001) (alteration in original) (citation omitted)).  The court must exercise its authority to grant a new trial pursuant to Rule 33 "sparingly and in the most extraordinary circumstances."  *Id.* (quotation marks and citation omitted).

### III.  DISCUSSION

**A.     Interstate Commerce Element of Hobbs Act Robbery**

*1.     Sufficiency of the Evidence*

Defendants argue that the evidence at trial was insufficient to prove the interstate commerce element of the offenses in Counts 1 and 2, *i.e.*, conspiracy to commit Hobbs Act robbery and attempted Hobbs Act robbery.

The Hobbs Act provides, in pertinent part:

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires to do so, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

(b) As used in this section- . . .

(3) The term "commerce" means . . . all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

18 U.S.C. § 1951.

The government bore the burden of proving, beyond a reasonable doubt, that Defendants' acts, had they been completed, would have affected interstate commerce.  *See United States v. Parkes*, 497 F.3d 220, 226 (2d Cir. 2007).  However, a *de minimis* showing of an effect on interstate commerce was sufficient.  *Id.* at 230; *see also United States v. Arena*, 180 F.3d 380,

3

390 (2d Cir. 1999) (government need only make a "showing of a very slight effect on interstate commerce" for Hobbs Act purposes); *United States v. Elias*, 285 F.3d 183, 188 (2d Cir. 2002) ("[I]t is well established that the burden of proving a nexus to interstate commerce is minimal."); *United States v. Perrotta*, 313 F.3d 33, 36 (2d Cir. 2002) ("[I]f the defendant's conduct produces any interference with or effect upon interstate commerce, whether slight, subtle or even potential, it is sufficient to uphold a prosecution under the Hobbs Act.") (internal quotations omitted).

At trial, the evidence suggested that the robbers sought marijuana and proceeds of marijuana sales, which belonged to the boyfriend of one of the occupants of the apartment that they invaded. The prosecution attempted to prove the interstate commerce element of the offense by showing that the boyfriend, who did not live in the apartment, sold marijuana that originated outside New York.

Construing the evidence in the light most favorable to the government, as this Court must, the evidence presented at trial was as follows. Stacy Roberts ("Ms. Roberts") lived in the apartment where the attempted robbery took place on March 6, 2008, along with her mother, Rosemarie Hill ("Ms. Hill"), her son, Rajiem Black ("Rajiem"), and her niece, Kyla Lawrence ("Kyla"). (Tr. 140-42.) Ms. Roberts' boyfriend of four to five years, Christopher Farquharson ("Mr. Farquharson"), who is known by the nickname, "Blacks," is a marijuana dealer. (Tr. 166-67, 253-54.) Ms. Roberts had lived with Mr. Farquharson for approximately three years prior to moving into her mother's apartment in late 2007. (Tr. 222, 253, 587.) At the time of the robbery, Mr. Farquharson did not live with Ms. Roberts but lived in an apartment that was also in the Bronx. (Tr. 223.)

During the time that Ms. Roberts was living with Mr. Farquharson and up to the date of the attempted robbery, Mr. Farquharson sold marijuana. (Tr. 254.) He would purchase a pound of marijuana for resale twice a week throughout the year. (Tr. 254-55.) Ms. Roberts testified that when she was living with Mr. Farquharson, she saw him with a pound of marijuana a couple of times and that he would keep marijuana in their home. (Tr. 256.)

Mr. Farquharson told Ms. Roberts that he sold two types of marijuana: "regular" and "Arizona."[4] (Tr. 257.) Mr. Farquharson never revealed to her his sources or customers, (tr. 265), but he did tell her that he paid approximately $1,000 per pound for Arizona marijuana and

---

[4] White's argument that Ms. Roberts' testimony was barred by *Crawford v. Washington*, 541 U.S. 36 (2004), is without merit because Mr. Farquharson's statements to her were not "testimonial" in nature. There was no evidence that Mr. Farquharson "had any awareness or expectation that [his] statements might later be used at trial." *See United States v. Goldstein*, 442 F.3d 777, 785 (2d Cir. 2006).

4

$500 for regular, (tr. 257-59).  The testimony of Craig Phildius ("Agent Phildius"), a special agent for the Drug Enforcement Agency ("DEA"), corroborated these prices.  (Tr. 409-10.)  Based on his experience as a DEA special agent, Agent Phildius testified that while it is possible to grow regular marijuana in the State of New York, most of the regular marijuana found in New York comes from Mexico.  (Tr. 401, 410.)  Some Arizona marijuana is grown in the mountains of Arizona, and other Arizona marijuana comes from Mexico but is shipped through Arizona.  (Tr. 410-11.)  Agent Phildius told the jury that he has never seen a strain of Arizona marijuana grown outdoors in the State of New York.  (Tr. 411.)

On March 7, 2008, the day after the attempted robbery, Mr. Farquharson was pulled over by the police while driving his car because he was not wearing a seatbelt.  (Tr. 487.)  The police officer found approximately 6.6 pounds of marijuana on the back seat of his car and in the trunk, including a large brick of marijuana and three large Ziploc bags that contained a pound of marijuana each, as well as $791 in cash.  (Tr. 488, 490, 493, 497.)  Mr. Farquharson was arrested.  (Tr. 259-60.)

Ms. Roberts testified that she believed the robbers entered her apartment because they thought Mr. Farquharson stored his marijuana and/or money from marijuana sales in the home that she shared with her mother, son and niece.  (Tr. 269.)  This theory was amply supported by the testimony at trial.  Upon entering the apartment, the robbers asked, "Where's Stacy [*i.e.*, Ms. Roberts]?"  They also demanded to know "where Blacks [*i.e.*, Mr. Farquharson] left the stuff," and where the "money" and the "food" were.  (Tr. 153-54, 159, 163-65, 167, 193-95, 204, 575-77, 579.)  The testimony at trial established that "food" is slang for marijuana.  (*See, e.g.*, tr. 174.)  Further, the robbers, who were evidently under the mistaken impression that Ms. Hill was Mr. Farquharson's mother, asked Ms. Hill where they could find her son.  (Tr. 588-89.)

A rational juror could have inferred that the robbers expected to find Mr. Farquharson's marijuana and drug money in Ms. Roberts' apartment due to his and Ms. Roberts' close relationship.  Mr. Farquharson would visit Ms. Roberts' apartment two to three times a week.  (Tr. 175, 586.)  Although Ms. Roberts and Ms. Hill testified that Mr. Farquharson never, or hardly ever, slept over at their apartment (tr. 175, 222), Rajiem testified that Mr. Farquharson would sleep over "sometimes," (tr. 587).  Rajiem also told the jury that Mr. Farquharson had lived in the apartment where the attempted robbery took place but moved out a couple of months before the attempted robbery.  (Tr. 588.)  It was evident at trial that the robbers were not seeking anything that belonged to Ms. Roberts or Ms. Hill, but rather hoped to find Mr. Farquharson's

5

marijuana and/or drug proceeds, both of which were, in fact, found in Mr. Farquharson's car the day after the attempted robbery.  (*See* tr. 174, 260.)

In addition to his testimony that most "regular" marijuana in State of New York comes from Mexico and that "Arizona" marijuana comes from Arizona or Mexico, Agent Phildius said that, in his experience, only a "very small percentage," 1% to 2% or lower, of the marijuana trafficked in New York City is actually produced in the State of New York.  (Tr. 409, 422.)  Almost all of the marijuana that ends up in New York City comes from Mexico and Jamaica, and the "vast majority" of the marijuana that he has seen in his investigations has traveled across state or country lines.  (Tr. 407, 417.)  The small percentage of marijuana that originates in the State of New York is grown either outdoors during the warm months or indoors under artificial lights. (Tr. 408.)  Agent Phildius' testimony was based on his experience as a special agent for the DEA for eight years, during which he has been involved in approximately seventy-five investigations of narcotics traffickers in New York City, mostly dealers of hundreds to thousands of pounds of marijuana.  (Tr. 401, 403.)

Based on this evidence, a reasonable jury could find, beyond a reasonable doubt, that the prosecution had made the required *de minimis* showing of a nexus to interstate commerce.  Had the robbers found and stolen Mr. Farquharson's marijuana or marijuana proceeds, they would have depleted the assets of a person who distributes at least one type of drug that crosses state lines, *i.e.*, Arizona marijuana, which would have had an impact on interstate commerce.  *See Elias*, 285 F.3d at 189 (finding a sufficient connection to interstate commerce where a robbery depletes the assets of a business that regularly purchases goods produced out-of-state); *see also United States v. Jamison*, 299 F.3d 114, 119 (2d Cir. 2002) (interstate commerce element satisfied where the target of the attempted robbery carried commingled cash that he used to purchase clothing inventory for his clothing and drug businesses, as well as personal expenses, and thus the attempted robbery "would have substantially diminished his inventory purchases of clothing manufactured in Asia, Guatemala, California, Massachusetts, and Maine, and cocaine originating outside the State of New York").  The evidence here is stronger.

In *Parkes*, which also involved "a botched robbery targeting drugs and drug proceeds," 497 F.3d at 223, the Second Circuit held that the evidence was sufficient to support a finding that the attempted robbery would have affected interstate commerce, where the robbers intended to enter a marijuana dealer's place of business and rob marijuana and drug proceeds, and an experienced government investigator testified that marijuana was "almost exclusively trucked

6

into the United States, predominantly through Mexico," and that "[v]ery little" marijuana is grown in New York, *id.* at 231 (alteration in original).  The Circuit held the evidence to be sufficient, despite the fact that the government investigator acknowledged that marijuana is grown within the State of New York and "there was no particularized evidence as to the interstate nature (*vel non*) of [the] drug-dealing business: *i.e.* the origin of his marijuana, his suppliers, the route and instrumentality of delivery . . . , his buyers, or his use of the proceeds from drug sales." *Id.* at 226.  Moreover, in *Parkes*, the target of the robbery was only a "local, part-time marijuana dealer," *id.*, who ran a "small but ongoing enterprise," *id.* at 231.  The Court held that "a reasonable juror, hearing this evidence, could have found that the attempted robbery of [the marijuana dealer's] marijuana or proceeds would have affected interstate commerce." *Id.* at 231 (citing 18 U.S.C. § 1951(a)).

Here, not only did Agent Phildius, like the government investigator in *Parkes*, testify that only a very small percentage of marijuana trafficked in New York comes from the State of New York, but the evidence also established that the target of the robbery, Mr. Farquharson, traded in a strain of marijuana that comes from, or ships through, Arizona.  Therefore, a reasonable juror could have inferred that had the robbers been successful in stealing his marijuana or money, the robbery would have had an effect on interstate commerce.  *See United States v. Lofton*, 275 Fed. App'x 30, 34 (2d Cir. 2008) (holding that a reasonable juror could infer that "if [the co-conspirator] had successfully obtained drugs and money from the robbery . . . , [the co-conspirator] would have increased the assets available to him to use in purchasing and obtaining cocaine for his drug dealing business, thereby affecting interstate commerce," where testimony from a government witness established that cocaine is not produced in New York).

### 2. *Jury Instruction*

White argues that the Court's jury instruction on the interstate commerce element of the Hobbs Act violation failed to reflect the law.  The Court instructed the jury, in relevant part:

> All that is necessary is that the effect of the acts that [the defendant] conspired or attempted to commit would either actually or potentially affect interstate or foreign commerce, in any way or degree.
>
> If you find beyond a reasonable doubt that the target of a robbery purchased or sold drugs that flowed in interstate commerce, and that the drugs or drug money that the defendant conspired or attempted to take belonged to the target, then this element is satisfied.
>
> Further, if you find that the defendant believed that the target of the robbery purchased or sold drugs that flowed in interstate commerce, then this element is satisfied, even if that belief is ultimately proven to be incorrect and the target of

7

the robbery was not in fact engaged in interstate commerce.
(Tr. 745-46.)

Because neither White nor his counsel challenged the Court's interstate commerce instructions, even though both were present at all times during the trial, including the charging conference and the charge to the jury, the instructions must be reviewed for plain error. *See United States v. Middlemiss*, 217 F.3d 112, 121 (2d Cir. 2000). "Reversal is required if the unpreserved error is plain, 'affects a substantial right,' and 'seriously affects the fairness, integrity, or public reputation of the judicial proceedings.'" *Id.* (quoting *United States v. Zvi*, 168 F.3d 49, 58 (2d Cir.), *cert. denied*, 528 U.S. 872 (1999) (citation omitted)).

Here, there was no error. White mischaracterizes the instruction when he alleges that it failed to state that the prosecution had to show an impact on interstate commerce. In fact, the jury was instructed that the target of the robbery must have purchased or sold drugs that "flowed in interstate commerce" and that the robbery, if completed, must have actually or potentially affected interstate or foreign commerce. The instruction also stated that it was necessary that the acts that Defendants conspired or attempted to commit would have actually or potentially affected interstate commerce. Similarly, in *Parkes*, which states the current law on this issue, the Circuit found no error where the court instructed the jury that "for a robbery to be punishable under federal law, the government must show that if the robbery occurred, interstate commerce would have been affected in some way[,] even if the effect would have been slight," 497 F.3d at 230 (alteration in original), and that the attempted robbery must have "potentially affected interstate commerce," *id.* at 224. Therefore, the jury instruction here is no ground for a new trial.

### 3.     *Agent Phildius' Testimony*

Defendants argue that it was reversible error to permit Agent Phildius to testify as an expert as to the provenance of most marijuana sold in the State of New York. White's reliance on *United States v. Amuso*, 21 F.3d 1251 (2d Cir. 1994), however, is misplaced. There, the Court held that "[a] district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror." *Id.* at 1263. Such was not the case here. Agent Phildius' testimony was based on his experience as a DEA special agent for eight years, during which he participated in approximately seventy-five investigations of narcotics traffickers in New York City, mostly dealers of hundreds to thousands of pounds of marijuana. (Tr. 401, 403.) His experience is obviously beyond the ken of the average juror.

8

Agent Phildius testified that in his experience he has found that the vast majority of marijuana trafficked in New York comes from outside the state; no other witness, fact or expert, provided similar testimony.

Defendants further argue that Agent Phildius' testimony violated Federal Rule of Evidence 702, which provides that testimony by "a witness qualified as an expert by knowledge, skill, experience, training, or education" is permissible so long as "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. Defendants rely on *United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008), in which the Court held that a police officer should not have been permitted to testify as an expert. *Mejia* is distinguishable, however. In that case, the Circuit objected to the fact that the officer's testimony addressed "matters that the average juror could have understood had such factual evidence been introduced," and held that it was not acceptable "to substitute expert testimony for factual evidence of murder in the first instance." *Id.* at 195. The officer testified not only about the structure and activities of the crime organization for which the defendant allegedly worked, but also about particular *facts* of the crime. *Id.*

Here, in contrast, Agent Phildius' testimony did not touch on the particular facts of the crimes with which Defendants were charged. Instead, his testimony involved the provenance of different types of marijuana, generally. (*See* tr. 414-15.) This was a matter of expertise that was beyond the knowledge of the average juror and could not have been presented other than by expert testimony. *See U.S. v. Tapia-Ortiz*, 23 F.3d 738, 740-41 (2d Cir. 1994) (holding that DEA agent's statements fell within acceptable bounds of expert testimony where agent "did not mirror[] the testimony of the Government's fact-witnesses," but rather testified about the purity of the cocaine seized from the defendants, the dosages that this cocaine would yield for resale on the street, the wholesale price of cocaine and the use of cash and nicknames by drug traffickers).

Further, Agent Phildius' reliance on marijuana investigations in which he participated, even if hearsay, was "consistent with the ordinary practices" of DEA agents. *See* 545 F.3d at 197 ("Under Rule 703, experts can testify to opinions based on inadmissible evidence, including hearsay, if experts in the field reasonably rely on such evidence in forming their opinions.") (internal quotation marks and citation omitted).

Agent Phildius' testimony also did not violate the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004), which held that the Confrontation Clause of the Sixth

9

Amendment prohibits the introduction into evidence of the out-of-court testimonial statements made by an absent witness, unless that witness is unavailable and the defendant had a prior opportunity for cross-examination.  The Circuit in *Mejia* held that "an officer expert's testimony violates *Crawford* if [the expert] communicated out-of-court testimonial statements of cooperating witnesses and confidential informants directly to the jury in the guise of an expert opinion."  545 F.3d at 198 (internal quotations and citation omitted).  Here, Agent Phildius did no such thing, as his opinion was based on his analysis of his investigations, and he refrained from communicating any testimonial statements to the jury.

**B.     Attempted Possession with Intent to Distribute Narcotics**

Defendants contend that no rational juror could have found them guilty of attempted possession with intent to distribute marijuana.  To establish this offense, "the government must show that the defendant (1) intended to possess and distribute the drugs and (2) took a 'substantial step' in furtherance of this offense."  *United States v. Porter*, No. 99-1235, 2000 WL 241343, at *1 (2d Cir. Feb. 1, 2000) (citing *United States v. Rosa*, 11 F.3d 315, 337 (2d Cir. 1993)).

Here, a reasonable jury, once it concluded that Scott and White were among the robbers, could have found that Defendants intended to steal marijuana for distribution.  First, as described above, in the course of the robbery Defendants repeatedly asked, "where's the food," *i.e.*, marijuana, and, by targeting Ms. Roberts, appeared to be searching for her boyfriend's marijuana inventory.  Second, the day after the attempted robbery, the police found Ms. Roberts' boyfriend with more than six pounds of marijuana in his car, a quantity obviously intended for sale and not personal use.  *See United States v. Martin*, 544 F.3d 456, 458-59 (2d Cir. 2008) (noting that the phrase "possession with intent to distribute" is "characterized by the possession of a sufficient quantity of narcotics to raise an inference that the defendant intends to distribute them").  Third, the extent of the preparations conducted by the coconspirators, such as hiding their faces with masks or bandanas, carrying guns, and working together in a group, suggests that they were not seeking marijuana for personal consumption.  Moreover, they targeted an apartment that was frequented, albeit not occupied, by a marijuana dealer.

A reasonable jury also could have concluded that the robbers took a "substantial step" to possess and distribute marijuana because they invaded Ms. Roberts and Ms. Hills' home and continued to ask for the drugs until they learned the police had arrived.  Therefore, drawing all inferences in favor of the prosecution, as is required, this Court must affirm the jury verdict.

While the evidence indicates that the robbers were searching for money, either in addition to or as an alternative to marijuana, the verdict indicates that the jury found that Defendants intended to steal marijuana.  *See United States v. Gutierrez-Zamarano*, No. 93-50389, 1994 WL 174236, at *2 n.3 (9th Cir. Apr. 26,1994) ("It is quite true that the intent element would be lacking if the jury accepted [the defendant's] theory at trial that he was merely involved in a scheme to steal the government's money as opposed to distribute drugs.  However, in convicting [the defendant] of attempt at the first trial, the jury necessarily rejected this theory.") (internal citation omitted).

### D.     Absence of Eye Witness Identification

Defendants argue that the evidence was insufficient to prove that they participated in the attempted robbery.  They point out that none of the victims identified either of them as one of the robbers, and none of the police officers saw either Defendant exit the apartment where the attempted robbery took place.  While the mere presence at a scene of a crime is insufficient to prove membership in a conspiracy, *see, e.g.*, *United States v. Johnson*, 513 F.2d 819, 823 (2d Cir. 1975); *United States v. Gaviria*, 740 F.2d 174, 184 (2d Cir. 1984), it was reasonable for the jury to find that the evidence, as a whole, established that Defendants were participants.  Construing the evidence in the light most favorable to the government, the evidence presented at trial was as follows.

Four or five robbers invaded Ms. Roberts' apartment.  (Tr. 154-55.)  Each robber carried a gun, wore either a bandana over the lower portion of his face or a mask similar to a black ski mask, a sweatshirt or jacket with a hood or a baseball hat, and gloves.  (Tr. 163-64, 171, 574.)  One robber's bandana was red.  (Tr. 575.)  The robbers used plastic zip ties to tie up Ms. Hill and her grandchildren, Rajiem and Kyla.  (Tr. 191-93, 577.)  From Ms. Hill's purse, the robbers took a black and grey cell phone and a pink cell phone attached to a string of pearl-like beads.  (Tr. 197-98.)  After Kyla shouted "police," the victims saw at least one robber jump through a window and more than one robber flee through the front door of the apartment.  (Tr. 169, 204, 581-82.)

When Police Officer Laura Varisco ("Officer Varisco") arrived at the scene, she saw two males exit the apartment and run up the internal stairs in the apartment building.  (Tr. 295.)  She noticed that one was taller and carried a gun.  (Tr. 295.)  The men were at least one flight of stairs ahead of her when she and several other police officers began running up the stairs in pursuit.  (Tr. 295-96.)  None of the apartment doors that were accessible from the stairs were

11

open, and Officer Varisco did not see or hear any of the other apartment doors being opened or closed. (Tr. 299.) There were no hallways leading off from the stairwell. (Tr. 299.) When the police officers reached the roof of the building, some officers ran to the left side and others to the right. (Tr. 299, 443.)

Scott and White were found on the right side of the building. It was cold and dark on the roof, but the officers used flashlights. (Tr. 304, 310.) Scott was lying on his stomach, and White was crouching inside the recess of a decorative structure. (Tr. 302, 337-38, 444.) Scott was wearing a red shirt, and although Officer Varisco did not recall that either of the men who exited the apartment was wearing a red shirt, she later saw a dark sweatshirt in the courtyard below the roof. (Tr. 306-08.) Police Officer Stephen Russo ("Officer Russo") described Scott as an African American male with braids in his hair and wearing a red shirt. (Tr. 337.) The police canvassed the roof but did not see anyone else. (Tr. 310, 449.) Neither Scott nor White lived in the apartment building, neither of them carried a flashlight or other type of illumination, and the police did not find any cigarettes or drinks, which could indicate a purpose for being on the roof. (Tr. 450, 452.)

Officer Russo testified that, on the roof, Scott was lying "right in the middle" of a collection of objects, including a glove, a blue bandana and a couple of plastic zip ties, which were "all around" and within two feet of him. (Tr. 338, 340, 344, 449.) The zip ties and bandana were also located close to the decorate structure where White appeared to be hiding. (Tr. 449.) The police also found two cell phones and a string of pearl-like beads on the roof close to the door through which they exited from the stairwell. (Tr. 310.) The cell phone that was found on the roof had a serial number that matched the serial number on the box in which one of Ms. Hill's cell phones had been packaged. (Tr. 201.)

Moreover, the police found a gun and a sweatshirt were found in the courtyard below the roof, and a neighbor of the apartment building found a jacket, a hat, a scarf and zip ties in her driveway, which was also below the roof. (Tr. 311, 425-26.) Finally, the two police officers who stayed in the courtyard to stand watch, while the other officers pursued the men up the stairs, did not see anyone exit the building, although they did leave the courtyard for approximately fifteen minutes. (Tr. 432, 505.) Police Officer Anthony Napoli heard a "thud" in the courtyard that sounded like a heavy object hitting the ground. (Tr. 432.) Officer Abraham Villavizar saw a dark silhouette of fabric fall from the rooftop and testified that it seemed as if something heavy was inside it as it fell rapidly. (Tr. 505.) He saw that the fabric was a black

sweatshirt, and then, after leaving the area for approximately fifteen minutes and then returning, he noticed a gun next to the sweatshirt where it had fallen.  (Tr. 506-07.)

A reasonable juror could conclude from this evidence that Scott and White, who were found on the roof, were also the men whom Officer Varisco saw running from the apartment where the attempted robbery took place.  Therefore, Defendants' motion for a judgment of acquittal is denied.

**E.     Jury Selection**

Finally, White argues that the Court should vacate the verdict on the ground that he was not present at the sidebar during limited *voir dire* and the for-cause and peremptory challenges.  First, "there is not now and never has been a right guaranteed in the federal Constitution that a defendant be present at sidebar *voir dire*."  *Zaire v. Mitchell*, No. 93 Civ. 6626, 1996 WL 82391, at *3 (S.D.N.Y. Feb. 27, 1996) (citing *United States v. Ruggiero,* 928 F.2d 1289, 1301 (2d Cir.), *cert. denied,* 502 U.S. 938 (1991); *United States v. Chang An-Lo,* 851 F.2d 547, 558 (2d Cir.), *cert. denied,* 488 U.S. 966 (1988); *United States v. Calbas,* 821 F.2d 887, 896 (2d Cir. 1987), *cert. denied,* 485 U.S. 937 (1988); *United States v. Hillard,* 701 F.2d 1052, 1064 (2d Cir.), *cert. denied,* 461 U.S. 958 (1983)).

Second, while Fed. R. Crim. P. 43(a)(2) provides that the defendant must be present at every trial stage, including jury impanelment, "[a]s with any constitutional right, a criminal defendant's right to be present at all stages of his trial can be waived through knowing and voluntary conduct."  *United States v. Torres*, Nos. 98-1075(L), 98-1115, 98-1372, 1999 WL 1022488, at *2 (2d Cir. Oct. 25, 1999).  In *Torres*, the defendant-appellant argued that his Fifth and Sixth Amendment rights, as implemented by Fed. R. Crim. P. 43(a), had been violated because the district court conducted a sidebar regarding peremptory challenges outside his presence.  *Id.*  The Circuit noted that the defendant had been in court while the district judge conducted *voir dire* and that the judge had announced a short recess to allow the parties to confer regarding, among other things, peremptory challenges.  *Id.*  After the recess, the defendant's counsel proceeded to the sidebar to discuss the challenges with the judge and counsel for the government, and although the defendant was "[f]ully aware of the purpose of the sidebar, [he] neither sought to join the sidebar, nor did he object, through his attorney or individually, to its being conducted out of his presence at the time."  *Id.*  The Circuit held, therefore, that the defendant had waived his right to be present at the sidebar.  *Id.* (citing *United States v. Gagnon,* 470 U.S. 522, 527-29 (1985) (defendants waived Rule 43 right to presence at *in camera* meeting

13

between judge and juror where defendants knew of meeting and its purpose but did not assert right to attend); *Cardinal v. Gorczyk,* 81 F.3d 18, 19-20 (2d Cir. 1996) (defendant waived right to presence at sidebar to conduct *voir dire* by remaining seated at counsel table during sidebar)).

Here, similarly, although there was no recess prior to the challenges portion of jury impanelment, the Court announced in open court, in Defendants' presence: "Let me explain to you while the lawyers think about who they want to challenge amongst you, if anybody, what the challenges are." (Tr. 105.) The Court then explained in detail to the jury the process of making peremptory and for-cause challenges and said that "I'm going to ask the lawyers to come to the sidebar and see if we can make our selections amongst you rather quickly." (Tr. 105.) While I was speaking to the jury, Defendants and their counsel had an opportunity to confer, and they did not request additional time. At no time did either Defendant or his counsel request that Defendant be present at the sidebar, and both Defendants remained seated at the counsel table. Therefore, Defendants waived their right to be present at the sidebar.[5]

### III. CONCLUSION

For the reasons stated, Defendants' motions are denied. Defendants' sentencing remains scheduled for January 30, 2009 at 4:00 p.m.

The Clerk of the Court is instructed to close this matter and remove it from my docket.

**IT IS SO ORDERED.**
**New York, New York**
**January ___, 2008**

_____
U.S.D.J.

---

[5] Even if it was an error for Defendants not to be present at the sidebar, it was a harmless error. *See United States v. Feliciano,* 223 F.3d 102, 111 (2d Cir. 2000). There is no evidence, and Defendants have not argued, that the jury was not impartial or that any impropriety occurred with respect to jury selection. *See Duran v. Phillips,* No. 04 Civ. 302, 2008 WL 3919195, at *7 (S.D.N.Y. Aug. 22, 2008) (defendant "is not entitled to relief unless the alleged failure to let him participate in the proceedings at the sidebar had a substantial and injurious effect or influence in determining the jury's verdict") (internal quotation marks and citation omitted).

14