UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
UNITED STATES,                                    :

                                                  :          08 Cr. 360 (LAP)

                        v.                        :

ANTONIO SCOTT,                                    :
*Defendant*.
-------------------------------------------------------------x


## MOTION FOR SENTENCE REDUCTION
## PURSUANT TO 18 U.S.C. § 3582(c)(1)


DAVID E. PATTON
Federal Defenders of New York
52 Duane Street, 10th floor
New York, NY 10007
By:     Sylvie Levine
        Assistant Federal Defender



AUDREY STRAUSS
Acting United States Attorney
One St. Andrew's Plaza
New York, NY 10007
By:     Sarah Kushner
        Assistant United States Attorney

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ................................................................. ii

II.  PROCEDURAL HISTORY ..................................................................... 2

A.   Trial and Sentencing ........................................................................ 2

B.   Prior Post-Conviction Proceedings .................................................. 2

C.   Pending Habeas Motion .................................................................... 2

D.   Incarceration Calculation ................................................................. 3

III. ARGUMENT ....................................................................................... 4

A.   This Motion Is Ripe for Review Because Mr. Scott Requested Relief from the BOP
     More than 30 Days Ago ................................................................... 4

B.   There Are Extraordinary and Compelling Circumstances Here ................................. 4

     1.   Subsequent changes in the law that would likely have shortened the length of
          Mr. Scott's sentence justify a sentence reduction ............................... 5

          a.   No valid predicate offense for § 924(c) ................................... 6

          b.   *Dean v. United States* ...................................................... 7

          c.   Amendments to Chapter Four of the Guidelines ................................ 9

     2.   Mr. Scott's young age at the time of his offense also supports a sentence
          reduction ................................................................... 10

     3.   The risks, and experiences, of being incarcerated during the COVID-19 ..... 12
          pandemic further support a sentence reduction ............................. 12

     4.   Mr. Scott's maintenance of strong family ties further supports his motion.. 15

     5.   Mr. Scott's rehabilitative efforts weigh in favor of a sentence reduction ...... 18

C.   Other 3553(a) Factors Justify the Requested Sentence Reduction ........................... 21

     1.   Mr. Scott is seeking a reduction of his sentence commensurate with other
          grants in this district ...................................................... 22

IV.  CONCLUSION ................................................................................. 23

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Dean v. United States*,
   137 S. Ct. 1170 (2017) ……………………………………………………… 7, 8

*Johnson v. United States*,
   135 S. Ct. 2551 (2015) …………………………………………………………… 3

*Moncrieffe v. Holder*,
   133 S. Ct. 1678 (2013) …………………………………………………………… 7

*United States v. Anderson*,
   16 Cr. 824 (JMF), 2020 WL 2849483 (S.D.N.Y. June 2, 2020) ………………….…… 23

*United States v. Avery*,
   14 Cr. 810 (JMF), 2020 WL 6728781 (S.D.N.Y. Nov. 16, 2020) ……………………… 13

*United States v. Barrett*,
   937 F.3d 126 (2d Cir. 2019) ……………………………………………………… 7

*United States v. Brooker*,
   976 F. 3d 228 (2d Cir. 2020) …………………………………………..………… *passim*

*United States v. Brown*,
   935 F.3d 43 (2d Cir. 2019) …………………………………………………….. 7

*United States v. Chavez*,
   549 F.3d 119 (2d Cir. 2008) …………………………………………………...… 7, 8

*United States v. Clark*,
   97 Cr. 817 (DC), 2021 WL 1066628 (S.D.N.Y. Mar. 18, 2021) …………….…… 6, 14, 22

*United States v. Clark*,
   12 Cr. 104 (SRU), 2021 WL 201253 (D. Conn. Jan. 20, 2021) ………………………… 6

*United States v. Cooper*,
   08 Cr. 356 (KMK) (S.D.N.Y. Apr. 28, 2020) …………………………………….... 23

*United States v. Davis*,
   139 S. Ct. 2319 (2019) …………………………………………………...…….7

*United States v. Fazio, Sr.*,
   11 Cr. 873 (S.D.N.Y May 15, 2020) ……………………………………………….... 23

*United States v. Fisher*,
   83 Cr. 150, 2020 WL 5992340 (S.D.N.Y. Oct. 9, 2020) …………………………..…….. 5

*United States v. Garcia*,
   11 Cr. 989 (JSR), 2020 WL 7212962 (S.D.N.Y. Dec. 8, 2020) …………………….…. 15

*United States v. Jasper*,
   18 Cr. 390 (PAE) (S.D.N.Y. Apr. 6, 2020) …………………………………………..… 22

*United States v. Jones*,
   15 Cr. 95 (AJN) (S.D.N.Y. May 24, 2020) …………………………………………...… 23

*United States v. Lizardi*,
   11 Cr. 1032 (PAE) (S.D.N.Y. Oct. 9, 2020) ……………………………...………… 4

*United States v. Monzon*,
   99 Cr. 157 (DLC), 2020 WL 4195272 (S.D.N.Y. June 2, 2020) ……………………... 22

*United States v. Nkanga*,
   18 Cr. 713 (JMF), 2020 WL 1529535 (S.D.N.Y. Mar. 31, 2020) …………..…..…….. 12

*United States v. Ozols*,
   06 Cr. 692 (JMF) (S.D.N.Y. Jun. 2, 2020) …………………………………….…... 13, 15

*United States v. Panton*,
   89 Cr. 346 (LAP), 2020 WL 4505915 (S.D.N.Y. Aug. 4, 2020) ………………………. 13

*United States v. Pena*,
   459 F.Supp.3d 544 (S.D.N.Y. 2020) …………………………………...…………… 12, 14

*United States v. Perez*,
   17 Cr. 513 (AT), 2020 WL 1546422 (S.D.N.Y. Apr. 1, 2020) …………………………. 13

*United States v. Resnick*,
   12 Cr. 152 (CM), 2020 WL 1651508 (April 2, 2020) ………………………………. 13, 23

*United States v. Resto*,
   08 Cr. 757 (DC), 2021 WL 1109467 (S.D.N.Y. Mar. 23, 2021) ……………...…..... 6, 21

*United States v. Tazewell*,
   07 Cr. 1035 (RMB), 2021 WL 21980 (S.D.N.Y. Jan. 3, 2021) …………………….…. 6

*United States v. Torres*,
   464 F. Supp. 3d 651 (S.D.N.Y. 2020) ……………………………………………..… 13

*United States v. Van Praagh*,
    14 Cr. 189 (PAC), 2020 WL 3892502 (S.D.N.Y. July 10, 2020) ……………………… 22

*United States v. Vargas*,
    88 Cr. 325 (VEC), 2020 WL 6886646 (S.D.N.Y. Nov. 24 2020) ……………..….. 5, 6, 10

*United States v. White*,
    09-0434-cr, 2010 WL 1461645 (2d Cir. Apr. 14, 2010) ………………………………… 2

## Statutes & Regulations

18 U.S.C. § 924(c) …………………………………………………...………..………. *passim*

18 U.S.C. § 1951 ………………………………………………………………… 2, 6, 7

18 U.S.C. § 3553(a) …………………………………………………..……… *passim*

18 U.S.C. § 3582(c)(1)(A) …………………………………………………… *passim*

21 U.S.C. § 846 …………………………………………………………………….. 2

28 U.S.C. § 2255 ………………………………………………………….... 2, 3, 6

U.S.S.G. § 4A1.1(e) (2008) ……………………………………………………… 9

U.S.S.G. § 4A1.1 (2018) …..................................................................................... 9

## I.    PRELIMINARY STATEMENT

Antonio Scott, through undersigned counsel, respectfully moves the Court pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) to reduce his sentence to time served with home confinement and a period of supervised release.  Mr. Scott has served more than 13 years of his 17-year sentence – 83 percent, with good time credit.  Mr. Scott was 22 at the time of his offense and had never been to jail for more than a year when he was given this sentence.

Today, it is unlikely that Mr. Scott would have faced such severe consequences, given several changes in the law since his sentencing.  Moreover, at age 35, Mr. Scott is in an entirely different phase of his life: he has matured significantly, as demonstrated by the active role he has maintained while imprisoned as a father, son, partner, cousin, and friend to his loved ones; the worth ethic he has honed at the BOP; and his educational accomplishments.  Mr. Scott writes: "I am a fully grown man with salt and pepper hair, educated, humble, drug-free, respectful and sophisticated after 13 years … of incarceration."  Exhibit D, Letter from Antonio Scott.  Moreover, the increased punitive nature of his incarceration during the COVID-19 pandemic (given the stringent conditions and risks to everyone's health), coupled with the significant sentence he has already served, is sufficient to achieve the statutory goals of sentencing.

As described below, there are extraordinary and compelling circumstances for a sentence reduction, including those recognized by the Second Circuit in *United States v. Brooker*, 976 F.3d 228 (2d Cir. 2020), and the § 3553(a) factors weigh in favor of granting this motion.  Mr. Scott has a home to return to, with his fiancé and three teenage children, and job prospects that will enable him to support his family and contribute to his community.  For the reasons described herein, we ask the Court to allow Mr. Scott to commence the next phase of his sentence immediately: supervised release with home confinement.

## II.     PROCEDURAL HISTORY

### A.     Trial and Sentencing

On October 21, 2008, Mr. Scott was convicted after a jury trial, held before the Honorable Harold Baer, of four counts: conspiracy to commit robbery, in violation of the Hobbs Act, 18 U.S.C. § 1951 (count one); attempting to commit robbery, in violation of the Hobbs Act, 18 U.S.C. §§ 1951 and 2 (count two); attempting to possess with intent to distribute marijuana, 21 U.S.C. §§ 846 and 2 (count three); and using or carrying a firearm during a "crime of violence and a drug trafficking crime," in violation of 18 U.S.C. §§ 924(c) and 2 (count four).[1]

On January 30, 2009, the court sentenced Mr. Scott to a total of 207 months: 87 months on counts one and two, to run concurrently; 60 months on count three, to run concurrently with counts one and two; and 120 months on count four, to run consecutively to counts one, two, and three.  Dkt. No. 71.  Mr. Scott is due to complete his prison sentence on June 5, 2023.  *See* BOP Website, *available at* bop.gov/inmateloc/.

### B.     Prior Post-Conviction Proceedings

The Second Circuit affirmed Mr. Scott's convictions in an unpublished summary order. *See United States v. White*, 09-0434-cr, 2010 WL 1461645 (2d Cir. Apr. 14, 2010).

In 2012, Mr. Scott filed a pro se motion challenging his convictions under 28 U.S.C. § 2255.  *See* Dkt No. 80; *see also Scott v. United States*, 11 Cv. 4638 (HB).  The motion was denied on June 11, 2012.  Dkt. No. 81.

### C.     Pending Habeas Motion

On June 6, 2016, Mr. Scott filed a second motion pursuant to 28 U.S.C. § 2255 based on

---

[1] There was a fifth count in the superseding indictment, Dkt. No. 31, but the government declined to pursue it at trial.

*Johnson v. United States*, 135 S. Ct. 2551 (2015).  Dkt. No. 97.[2]  Mr. Scott simultaneously

sought permission from the Second Circuit to file a second or successive habeas petition.  *See*

*United States v. Scott*, Case No. 16-1784.  This Court stayed Mr. Scott's petition pending the

Second Circuit's decision.  Dkt. No. 132, 134.

On May 12, 2020, the Second Circuit granted Mr. Scott leave to proceed with his second

petition because he "made a prima facie showing that the proposed § 2255 motion satisfies the

requirements of § 2255(h)."  Dkt. No. 135.  The Circuit transferred the case back to the District

Court, reasoning that "making that determination [regarding the predicate offenses] in the

present case would require detailed review of the criminal proceedings and factfinding that the

district court is better suited to perform."  *Id.*

Upon transfer, this Court set a briefing schedule.  Dkt. Nos. 137, 141.  Mr. Scott filed his

brief on June 26, 2020, Dkt. No. 147; the government responded on July 27, 2020, Dkt. No. 148;

and Mr. Scott replied on August 10, 2020, Dkt. No. 149.  The motion remains pending.

**D.      Incarceration Calculation**

Mr. Scott was arrested and presented for the instant offense on March 27, 2008.  Dkt.

Nos. 5, 7.  He was detained on consent at that proceeding (*see* Dkt. Minute Entry, Mar. 27,

2008), and has remained incarcerated through today.  Therefore, as of today, he has served more

than 13 years (over 156.5 months) in prison.

With good time credit, the Bureau of Prisons will have Mr. Scott serve 189.25 months of

his 207-month sentence.  Therefore, Mr. Scott has served approximately 83 percent of his

originally-imposed term of incarceration.

---

[2] Citations refer to the instant criminal case docket.  Mr. Scott's pending § 2255 motion was filed
in the criminal case and in *Scott v. United States*, 16 Cv. 5132.

### III.     ARGUMENT

### A.     This Motion Is Ripe for Review Because Mr. Scott Requested Relief from the BOP More than 30 Days Ago

The First Step Act ("FSA") expressly permits Mr. Scott to move this Court to reduce his term of imprisonment and seek compassionate release.  *See* 18 U.S.C. § 3582(c)(1)(A)(i).  A defendant can seek recourse through the courts after either (1) the federal Bureau of Prisons (BOP) declines to file such a motion on his behalf; or (2) there has been of lapse of 30 days from the warden's receipt of the defendant's request, whichever is earlier.  *Id.*

Undersigned counsel transmitted a request for compassionate release for Mr. Scott to the Warden at FCI Fairton on August 3, 2020.  *See* Exhibit F.  To date, the Warden has not granted his request.  Because far more than 30 days have passed since Mr. Scott's request was submitted to the BOP and because the BOP has not made a motion on his behalf in that time frame, this motion is ripe for the Court's review.

### B.     There Are Extraordinary and Compelling Circumstances Here

The Second Circuit recently clarified that, after the First Step Act, the district court alone decides what constitutes extraordinary and compelling reasons on a defendant's motion for compassionate release.  *See United States v. Brooker*, 976 F. 3d 228, 237 (2d Cir. 2020).  As the *Brooker* court stated:

> [T]he First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release.

*Id.*; *see also United States v. Lizardi*, 11 Cr. 1032 (PAE), Dkt. No. 2523 (S.D.N.Y. Oct. 9, 2020) ("Consistent with *Brooker* … the Court, may 'consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [it] in motions for

compassionate release.'" (quoting *Brooker*, 976 F.3d at 237) (alteration in original)); *United States v. Fisher*, 83 Cr. 150, 2020 WL 5992340, at *3 (S.D.N.Y. Oct. 9, 2020) (same).

In other words, "a district court's discretion in this area—as in all sentencing matters—is broad." *Brooker*, 976 F.3d at 237.  The Circuit specifically noted that the legislative history of § 3582(c)(1)(A) shows that Congress contemplated review of the "injustice" of an original sentence when weighing the merits of a sentence reduction.  *Id.* at 238.   The Circuit also said that the imposition of an "unusually long sentence," and a defendant's "age at the time of his crime," may support a finding of extraordinary and compelling circumstances.  *Id.*

When reviewing a motion for a sentence reduction, in addition to determining whether extraordinary and compelling reasons support the motion, the Court must "consider[] the factors set forth in section 3553(a) to the extent they are applicable."  18 U.S.C. § 3582(c)(1)(A).  A defendant's rehabilitation can also be considered (so long as it is not the sole ground for release). *See Brooker*, 976 F.3d at 238.  Moreover, "these arguments may also interact with the present coronavirus pandemic, which courts around the country, including in this circuit, have used as justification for granting some sentence reduction motions."  *Id.*

### 1.    Subsequent changes in the law that would likely have shortened the length of Mr. Scott's sentence justify a sentence reduction

In *Brooker*, the Second Circuit specifically recognized that the district courts' broad power to determine the existence of extraordinary and compelling reasons for a sentence reduction includes revisiting the "injustice of [a] lengthy sentence."  976 F.3d at 238.  "[I]n light of the FSA, courts have considered the severity or length of a defendant's sentence as part of their evaluation of the presence *vel non* of extraordinary and compelling circumstances."  *United States v. Vargas*, 88 Cr. 325 (VEC), 2020 WL 6886646, at *4 (S.D.N.Y. Nov. 24, 2020).

This is particularly true when the laws that bound the sentencing courts at the defendants'

original sentencings have since changed.  Indeed, "[n]umerous defendants facing sentences

imposed under mandatory Sentencing Guidelines or other since-invalidated laws or practices

have been granted compassionate release at least in part based on the perceived unfairness of

their original sentences."  *Vargas*, 2020 WL 6886646, at *5 (collecting cases); *see also United

States v. Clark*, 97 Cr. 817 (DC), 2021 WL 1066628, at *3 (S.D.N.Y. Mar. 18, 2021) (granting

§ 3582(c)(1)(A) motion after acknowledging that, due to significant changes in the law, "[i]f [the

defendant] were sentenced today, I likely would impose a lower sentence"); *United States v.

Tazewell*, 07 Cr. 1035 (RMB), 2021 WL 21980, at *7 (S.D.N.Y. Jan. 3, 2021) (granting §

3582(c)(1)(A) motion because the defendant was sentenced under a mandatory minimum that

was subsequently lowered by Congress, and thus, was "likely more severe than defendants

would face today"); *United States v. Clark*, 12 Cr. 104 (SRU), 2021 WL 201253, at *6 (D. Conn.

Jan. 20, 2021) (granting motion for a sentence reduction, in part, because of the crack-cocaine

disparity at the defendant's original sentencing);  *United States v. Resto*, 08 Cr. 757 (DC), 2021

WL 1109467, at *4 (S.D.N.Y. Mar. 23, 2021) (granting motion after finding that due to changes

in the guidelines, "if [defendant] were to be sentenced today, I would likely sentence him to a

term either equivalent to or shorter than the term he has already served").

In Mr. Scott's case, a number of changes in the law would likely have led to a lower

sentence today.

### a.    No valid predicate offense for § 924(c)

As laid out in Mr. Scott's pending motion pursuant to 28 U.S.C. § 2255, the Supreme

Court and Second Circuit have re-considered the definitions of qualifying predicate offenses for

18 U.S.C. § 924(c).  The government concedes that count 1 (conspiracy to commit Hobbs Act

robbery) is no longer a "crime of violence." *See* Dkt. No. 148.  Mr. Scott maintains that count 2

(attempted Hobbs Act robbery) is also not a "crime of violence" and count 3 (attempting to

possess with intent to distribute marijuana) is not a "drug trafficking crime."  Thus there was no

valid predicate for count 4 (violating 18 U.S.C. § 924(c)).  *See* Dkt. Nos. 147, 149.  And, even if

the Court determines there was at least one valid predicate, it would be impossible to know if the

jury relied on it – or an invalid predicate (the government concedes count 1 is now invalid).  *See*

*id.* Mr. Scott's argument is based on cases that were decided since Mr. Scott was sentenced.  *See*

*id.* (citing *United States v. Davis*, 139 S. Ct. 2319, 2327 (2019); *Moncrieffe v. Holder*, 133 S. Ct.

1678, 1685 (2013); *United States v. Barrett*, 937 F.3d 126, 128 (2d Cir. 2019)).

If the Court were to agree with Mr. Scott's analysis, the 120-month consecutive sentence

on count 4 would be invalid today.  The remaining sentence of 87 months has long expired.  The

Court can consider this 10-year differential in determining whether there are "extraordinary and

compelling circumstances" for a sentence reduction.

### b.   *Dean v. United States*

In 2017, the Supreme Court explicitly authorized a district court to consider the total

sentence that a defendant is going to serve on all counts, including a mandatory minimum

sentence, as opposed to evaluating the proper sentence for each count in a vacuum.  *Dean v.*

*United States*, 137 S. Ct. 1170 (2017).  Specifically, the Supreme Court authorized sentencing

courts to consider the mandatory minimum sentence on a § 924(c) count when considering the

appropriate sentence on the predicate counts.  *Id.*  In doing so, it overruled the Second Circuit's

decision in *United States v. Chavez*, 549 F.3d 119, 135 (2d Cir. 2008).  *See United States v.*

*Brown*, 935 F.3d 43, 45 (2d Cir. 2019) ("[W]e conclude that the Supreme Court's decision

in *Dean* has abrogated this Court's decision in *United States v. Chavez* … which had precluded a

sentencing judge from considering the severity of mandatory consecutive minimum sentences required by section 924(c) in determining sentences for underlying predicate counts.")

At Mr. Scott's sentencing in 2009, the government insisted that the Court follow the now-overruled *Chavez* decision. The government stated: "[Defense counsel] implies that the court should consider the ten-year mandatory minimum, and somehow counterbalance the robbery sentence in order to compensate the defendant for the ten years, the statutory minimum…. *United States v. Chavez*, 549 F.3d 119 prohibits the court from doing that. That's not a proper consideration." *See* Dkt. No. 127, Sentencing Transcript ("Sent. Tr.") 17-18.[3]

Today, the law says the opposite. As a result, there is good reason to believe that Mr. Scott would have faced a lower sentence today than he did in 2009. Today, the Court is empowered to consider the total sentence and ask, how much more than 10 years was appropriate for the then 22-year-old Mr. Scott? We submit that, after *Dean*, it is unlikely that the sentencing court would have imposed an additional 7 years. Indeed, one of the defense's main arguments at sentencing was that, in state court (where Mr. Scott and his co-defendant were initially prosecuted), he would have faced a minimum of 5 years (total) for the same conduct, whereas in federal court he faced more than triple that amount of time because of the mandatory minimum and applicable Guidelines range. Had the sentencing court been governed by *Dean*, instead of *Chavez*, it could have considered that Mr. Scott, then age 22, had never previously been to jail for more than 1 year before (*see* PSR ¶¶ 35-57); that, therefore, the mandatory minimum sentence of ten years alone would have been a ten-fold increase; and the mandatory minimum

---

[3] The Government also incorporated its argument regarding Mr. Scott's co-defendant (who was convicted of the same four counts as Mr. Scott): "In light of the Second Circuit's decision in *Chavez*, the government submits that the Court is without authority to reduce the defendant's sentence on Counts One, Two or Three of the Indictment on the basis that the total sentencing, including the ten-year minimum applicable to Count Four, is too severe." Dkt. No. 65.

plus 7 additional years would have been greater than necessary.  Thus, the Court can also consider this subsequent change in the law in finding there are "extraordinary and compelling circumstances" to grant the instant motion.

### c.      Amendments to Chapter Four of the Guidelines

In 2010, the year after Mr. Scott was sentenced, the United States Sentencing Commission removed the "recency" provision of then-Chapter 4A1.1(e), which added two points when a person had been released from a sentence of imprisonment within two years.  *See* U.S.S.G. § 4A1.1(e) (2008).  In doing so, the Sentencing Commission cited to its "multi-year review," in which "research … indicated that consideration of recency only minimally improves the predictive ability" of future misconduct.  *See* Amendments to 2010 Guidelines.[4]   The Commission also concluded that recency "does not necessarily reflect increased culpability."  *Id.* Congress adopted the Sentencing Commission's recommendations and, beginning with the 2010 edition of the guidelines through today, there is no "recency" provision.  *See* U.S.S.G. § 4A1.1.

Mr. Scott's guidelines calculation in 2009 included two of the now-defunct "recency" points, *see* PSR ¶ 62, for a total of 8 criminal history points, placing him in category IV.  *See* PSR ¶ 63.  If calculated today (or at any time after November 2010), Mr. Scott's guidelines range would have properly been calculated as 6 points, placing him in category III.

At sentencing, at the urging of defense counsel, Judge Baer ultimately decided that category IV overstated Mr. Scott's criminal history and chose to deem him in category III, by minimizing the importance of his misdemeanor simple drug possession offenses.  Sent. Tr. 17, 21-22.  The court went on to sentence Mr. Scott at the *bottom* of the newly-calculated range.

---

[4] *Available at* https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20100503_RFP_Amendments_0.pdf.

Without the recency points, the court might have reduced Mr. Scott's criminal history category further, to category II. Indeed, Judge Baer said that he had initially contemplated using the bottom of category II, instead of the bottom of category III. *Id.* at 21 ("I reduced it to II, but I think [government counsel] convinced me that that wouldn't be correct … [and I have decided on] eighty-seven rather than 78 months….").

Given these changes in the law, it is likely that the sentence Mr. Scott received in 2009 was lengthier and more severe than he would have received if sentenced today. And, Mr. Scott has long since completed the mandatory term required by his conviction for count four (i.e. ten years). If sentenced today, the changes in the definitions of § 924(c) predicates, the court's new ability to consider the 10-year mandatory sentence in determining the total sentence, and the removal of his recency criminal history points, all make it likely that he would face a total sentence less than or equivalent to the term he has already served.

### 2. Mr. Scott's young age at the time of his offense also supports a sentence reduction

Mr. Scott was 22 years old when he was arrested for this crime. Today, 13 years later, he is in an entirely different phase of his life and psychological development. The *Brooker* Court and others have expressly recognized a defendant's age at the time of his crime as a factor that may be considered in an application pursuant to § 3582(c)(1)(A). *See Brooker*, 976 F.3d at 238; *Vargas*, 2020 WL 6886646, at *2 (noting that the defendant was only 23 at the time of his offense and was decades older at the time of the application).

It is well-settled among social scientists that "age is one of the most consistent correlates of criminal behavior," and that crime rates drastically plummet after the age of 25. *Pathways*

*Newsletter*, Vol. 19 (Univ. of Pittsburgh Medical Center).[5]  "Today, the peak age-crime involvement (the age group with the highest age-specific arrest rate) is younger than 25 for all crimes reported."  Ulmer and Steffensmeier, *The Age and Crime Relationship: Social Variation, Social Explanations.*[6]  "In fact, a significant portion of U.S. national crime rate trends over time can be explained by fluctuations in the proportion of the population in the crime-prone age group of 15- to 24-year-olds."  *Id.* (internal citations omitted).  The "age-crime curve" is often explained, in great part, by brain development and psychology: "evidence has amassed from neuropsychology that aspects of brain development relating to emotional maturity, decision making, and risk taking continue into the mid-20's."  *Id.* (internal citations omitted).  Indeed, "[b]iological changes in the prefrontal cortex during adolescence and the early 20s lead to improvements in executive functioning, including reasoning, abstract thinking, planning, anticipating consequences, and impulse control."  *Id.*

At the time Mr. Scott committed the instant offense, he was 22 – squarely within the statistical "peak age" range of criminal activity.  Today, at age 35, he is well past that stage of physical, psychological, and social development.  When he is released from prison, he will be re-entering the community as a full-fledged adult.  He has undoubtedly matured in the last 13 years.  The Court can and should consider Mr. Scott's age at the time of his offense, and his growth since that time, in evaluating the instant motion.

---

[5]  Sourced from Sweeten, G., Piquero, A.R., & Steinberg, L., *Age & The Explanation of Crime, Revisited*, Journal of Youth and Adolescents, Vol. 42(6), at 921-938 (2013), *available at* https://www.pathwaysstudy.pitt.edu/documents/PathwaysNewsletter_vol19.pdf.

[6]  Published in *The Nurture versus Biosocial Debate in Criminology*, (K. Beaver, B. Boutwell, and J.C. Barnes, Sage Publications 2015), *available at* https://www.sagepub.com/sites/default/files/upm-binaries/60294_Chapter_23.pdf.

3.      The risks, and experiences, of being incarcerated during the COVID-19 pandemic further support a sentence reduction

The world is in the throes of a deadly pandemic, which the sentencing court could not have possibly contemplated when it imposed Mr. Scott's sentence in 2012.  In the United States alone, more than 31 million people have been infected with the coronavirus and more than 560,000 people have died.[7]  The Federal Bureau of Prisons has been at the epicenter of this public health crisis: more than 46,000 incarcerated people have tested positive in federal prisons and 226 federal prisoners have died.[8]

"[T]he COVID-19 pandemic presents an extraordinary and unprecedented threat to incarcerated individuals."  *United States v. Pena*, 459 F. Supp. 3d 544, 551 (S.D.N.Y. 2020); *see also United States v. Nkanga*, 18 Cr. 713 (JMF), 2020 WL 1529535, at *1 (S.D.N.Y. Mar. 31, 2020) ("The country faces unprecedented challenges from the novel Coronavirus…. Those detained in jails and prisons face particularly grave danger.").  Prisons are a "perfect breeding ground for the virus" because they are "overcrowded facilities, many of them old and poorly ventilated, with tight quarters and with hygiene standards that are difficult to maintain."  Lee Kovarsky, *Pandemics, Risks, and Remedies*, 106 Va. L. Rev. Online 71, 73-74 (2020).  COVID-19 rates are more than four times as high in prisons as the general population.[9]  Incarcerated

---

[7] *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. Times (Apr. 14, 2021), *available at* https://nyti.ms/39jvJEY.

[8] Bureau of Prisons website (Apr. 14, 2021), *available at* https://www.bop.gov/coronavirus/.

[9]  Beth Schwartzapfel, Katie Park & Andrew Demillo, *1 in 5 prisoners in the US has had COVID-19, 1,700 have died*, Associated Press (Dec. 18, 2020), *available at* https://apnews.com/article/pandemics-race-andethnicity-prisons-united-states-coronavirus-pandemic-0bef0673013aa579551db5ad61b885e0.

people who contract the virus are more than twice as likely to die from it.[10]  Mr. Scott's prison,

FCI Fairton, is no exception.  268 people incarcerated there have been diagnosed with COVID-

19 since the start of the pandemic, approximately one-third of the population.[11]  There has been

one prisoner death.  *Id.*  Today there are 3 positive staff members at the facility; as recently as

April 14, there was one positive prisoner and 36 positive staff members.  *Id.*

"Court[s] … have concluded that the threat of COVID-19 to those in prison, by itself,

constitutes an extraordinary and compelling reason for compassionate release."  *United States v.*

*Avery*, 14 Cr. 810 (JMF), 2020 WL 6728781, at *1 (S.D.N.Y. Nov. 16, 2020) (citation and

quotations omitted).  Many courts have considered and granted compassionate release given the

risks of the instant pandemic.  *See, e.g.*, *United States v. Panton*, 89 Cr. 346 (LAP), 2020 WL

4505915 (S.D.N.Y. Aug. 4, 2020); *United States v. Resnick*, 12 Cr. 152 (CM), 2020 WL

1651508 (S.D.N.Y. Apr. 2, 2020); *United States v. Perez*, 17 Cr. 513 (AT), 2020 WL 1546422

(S.D.N.Y. Apr. 1, 2020); *United States v. Ozols*, 06 Cr. 692 (JMF), 2020 WL 2849893 (S.D.N.Y.

Jun. 2, 2020).  This includes people incarcerated at FCI Fairton.  *See, e.g.*, *United States v.*

*Torres*, 464 F. Supp. 3d 651 (S.D.N.Y. 2020).

Even if a person has "no underlying medical conditions that heighten his risk [of

suffering consequences of COVID-19], there is an increased risk merely from being in prison."

*Clark*, 2021 WL 1066628, at *4 (internal citations omitted).  Thankfully, Mr. Scott does not have

any current medical conditions that place him at higher risk for complications from COVID-19.

_____

[10]  Eric Levenson, *Prison inmates are twice as likely to die of Covid-19 than those on the outside,
new report finds*, CNN (Sept. 3, 2020), *available at*  https://www.cnn.com/2020/09/02/us/prison-
coronavirus-clustersreport/index.html.

[11]  *See* BOP Website (Apr. 14, 2021) (Apr. 18, 2021), *available at*
https://www.bop.gov/locations/institutions/fai/; https://www.bop.gov/coronavirus/.

13

However, he has a history of acute bronchitis while in BOP custody in 2015 and 2016.  We know that COVID-19 can have severe respiratory consequences and that people with lung and breathing diseases are at a heightened risk.[12]  Additionally, as a male, he is 2.4 times more likely to die from COVID-19 complications than a comparable female.[13]  As a Black person, he is almost three times more likely to die from complications than comparable white, non-Hispanic persons.[14]

The conditions under which Mr. Scott has been imprisoned during the COVID-19 pandemic further support his application.  "Apart from the risk of infection, the pandemic has made prison conditions even more difficult than they usually are."  *Clark*, 2021 WL 1066628, at *4.  Being incarcerated during a global and deadly pandemic has undoubtedly increased the amount of punishment to which Mr. Scott has been subjected.  As one court granting compassionate release has stated:

> The time [the defendant] has served in prison has already achieved much of the original sentence's retributive, deterrent, and incapacitative purpose. And [his] continued detention now poses him imminent danger of serious injury and death—a circumstance that the Court never considered when imposing its sentence.

*Pena*, 459 F. Supp. 3d at 551 (granting compassionate release to defendant who "helped orchestrate a violent armed robbery that terrorized multiple victims, including children").  For

---

[12]  *See* CDC Website, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

[13]  *See* Derek M. Griffith et al., *Men and COVID-19: A Biopsychosocial Approach to Understanding Sex Differences in Mortality and Recommendations for Practice and Policy Interventions*, CDC (July 16, 2020), *available at* https://www.cdc.gov/pcd/issues/2020/20_0247.htm.

[14]  *See* CDC Website, *COVID-19-Associated Hospitalization and Death by Race/Ethnicity*, *available at* https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/racial-ethnic-disparities/disparities-hospitalization.html.

the same reasons, the goal of deterrence has also been achieved. *See Ozols*, 2020 WL 2849893, at *2 ("The 'need for general deterrence,' has also been addressed by [the defendant's] substantial time served (not to mention the several months served with the grave risk of illness posed by COVID-19 to those in prison).").

Mr. Scott, like other people imprisoned during this time, has been subjected to lockdowns, commissary restrictions, and visit bans, all of which have drastically increased the punitive and deterrent value of every day he has spent in prison. At the same time, his rehabilitative opportunities have decreased. This type of incarceration, which the sentencing court could not have predicted at the original sentencing, supports an argument that the statutory goals of sentencing have already been satisfied. *See United States v. Garcia*, 11 Cr. 989 (JSR), 2020 WL 7212962, at *3 (S.D.N.Y. Dec. 8, 2020) ("What the Court did not anticipate was the coronavirus pandemic, and here the pandemic is relevant to consideration of other § 3553(a) factors…. Viewed through these lenses, the sentence [the defendant] is now serving looks materially different from the sentence the Court envisioned…."). Certainly, it would have been impossible for Judge Baer to know how drastically federal prison life would change in 2020.

**4.      Mr. Scott's maintenance of strong family ties further supports his motion**

At sentencing in 2009, Mr. Scott's attorney characterized him as "a person who cares about his family, a person who has the support of his family." Sent. Tr. 4. Today, more than a decade later, that remains the best way to describe him. Mr. Scott's partner, Teeisha Bussey, writes: "Antonio is a very kind man and a real sweetheart who loves his entire family." Exhibit E, Letters of Support. His family and friends describe him as "kind, generous and very protective," *id.* (Craig Stokes); "the kind of person that hated when people he loved were struggling," *id.* (Dwight Lashley); and "wise beyond his years and … always able to offer me

*words of encouragement without any judgement whatsoever," id.* (Tanika Murray).

Mr. Scott is eager to reunite with his mother.  She writes: "It's difficult for me because he has been gone so long. It hurts me mentally. I have been depressed but I have been doing my best to help my grandchildren and provide for them in his absence."  *Id.* (Sheryl Hinkson). During Mr. Scott's incarceration, his grandmother, aunt, and sister have passed away.  *See id.* His family describes breaking the news of his sister's death to Mr. Scott: "We didn't want to tell Antonio she was sick because he was already sad at the time in prison. When we told him she passed, Antonio bawled and cried on the line."  *Id.*  "Losing his sister really hurt him because he was away for so long, he couldn't even say goodbye to her."  *Id.* (Dwight Lashley).

Mr. Scott is the father of three now-teenagers (ages 19, 16, and 13).  He and Ms. Bussey have worked hard to maintain his role as an active father in their lives despite his physical absence.  They have used visits, emails, phone calls, and letters to keep their bond strong.  Ms. Bussey writes: "Antonio asks them how things are going, how the family is doing and checks in to see how they are doing in school. Whenever he calls, I make sure that he is able to speak to our kids and I try to give them space to have one on one time with their father."  *Id.*

Mr. Scott is extremely proud of his children's accomplishments, and has always encouraged them to stay on the right path.  Ms. Bussey writes: "Antonio and I share three beautiful children who are now becoming beautiful young adults. Our oldest is Q█████ who is 18 years old, followed by A███████, and finally our baby A██████ who just turned 13."  *Id.* Their oldest son is a dietary specialist in a hospital and plans to attend college for engineering; their middle son is passionate about music; and their youngest, a daughter, wants to follow her mother into the nursing field.  Mr. Scott's childhood friend, Tanika Murray writes, "I knew his kids would have this amazing man as a father to love and guide them the way he was there for

me.  Now his kids are teenagers and they all really miss him and want him to come home."  *Id.*

Mr. Scott's middle son has struggled the most in his father's absence.  He has a learning

disability and often acted out without his father at home.  Mr. Scott describes his efforts to guide

A███████ remotely, encouraging him to listen to his mother and have hope when things feel

difficult.  Mr. Scott's mother writes: "He has done his best to be present for them from jail and I

know he wants more than anything to be present with them in person."  *Id.* (Sheryl Hinkson).

     After more than a decade, many of the ways that Mr. Scott and his family had found to

manage and maintain their relationships ground to a halt due to the COVID-19 pandemic.  "We

haven't been able to see Antonio due to restrictions at his facility, but A██████ and A██████

speak to their father every day."  *Id.* (Teeisha Bussey).  "Due to the Coronavirus procedures and

the long distance, I haven't been able to see him in a long time."  *Id.* (Sheryl Hinkson).  Never in

the past 13 years have Mr. Scott and his family had such serious hurdles to overcome.  Mr. Scott

has (luckily) been housed in or near New York in recent years, which helped him to maintain his

family ties, but the visit ban—which has now persisted for more than a year—has been

extremely difficult on them (in addition to greatly increasing the punitive and deterrent impact of

Mr. Scott's sentence).

     Mr. Scott has concrete reentry plans.  Upon his release, he will live with Ms. Bussey and

their children in Dutchess County, New York.  (His family moved out of the Bronx after Mr.

Scott's sentencing.)  They all look forward to reuniting and becoming a family unit again.

"When Antonio comes home, I want him to be with his family. We are going to support him

emotionally as we have for the last 14 years."  *Id.* (Teeisha Bussey).  "[H]e really wants to make

up as much time with our kids and me as possible."  *Id.*

Mr. Scott's role as a father has kept him focused on the future: "Antonio tells me all the time that his children make[] him better, and speaking to them motivates him to be a positive light for his family when he comes home." *Id.*

### 5.    Mr. Scott's rehabilitative efforts weigh in favor of a sentence reduction

To become that positive light for his family, Mr. Scott dedicated his time in prison to improving himself.  He has spent his time – and in particular, the last 7 years – working hard to change the trajectory of his life.

In his letter to the Court, Mr. Scott describes how hard the first 5 years of his prison sentence were, based on the choices he made: "my way as a young, fragile youth was to maintain a tough guy perception so I would be left alone."  Exhibit D, Letter from Antonio Scott.  As a result, he got in trouble and "this," he explains, "led to the majority of my incident reports.  *Id.* But then he started to learn from his own mistakes: "As my age starts increasing and reality was teaching me to be wiser, I realized the amount of pain I was putting my family through by them not being able to speak to me consistently through the emails or the phone due to me being placed on disciplinary segregation."  *Id.*  After 5 years in prison, Mr. Scott recalls a visit from his children, at which "I had to promise them that I was going to get it together and do what it takes to [all]eviate trouble."  *Id.*  Starting that day, Mr. Scott changed his life:

> I started studying, acquired my GED, maintained an institutional job … received certification on various programs, started building stronger family ties and placed more focus on fighting to regain my freedom, something I learned over time held the most sacred value.

*Id.*  He has lived that change: since 2014, Mr. Scott has had only one disciplinary incident.[15]

As part of his commitment to rehabilitation, Mr. Scott earned his high school equivalency

---

[15] The disciplinary incident was in August 2020 for being insolent to a staff member.

diploma (GED) in December 2014.  His certificate and picture from his graduation day are attached.  *See* Exhibit A, Graduation Photo and Certificate.  Mr. Scott also engaged in programming at the Bureau of Prisons, including drug abuse education, conflict resolution, and finance.  *See* Exhibit B, BOP Certificates.  Of particular importance, Mr. Scott took a 350-hour course in CASAC (Credentialed Alcoholism and Substance Abuse Counseling).  *See id.*  The extensive coursework helped Mr. Scott examine his own substance use history, and he acquired the skills and qualifications to counsel others.

Mr. Scott also furthered his technical education via correspondence courses.  *See* Exhibit C, Electronics Technicians Association Certificates.  He completed courses in electronics, air conditioning, and analog and digital technology.  *Id.*  These certificates will offer him concrete employment opportunities once he returns to the job market.

Also of value to his future job prospects will be his proven work ethic while in prison.  Mr. Scott has always had a job in the jail, including construction and facilities work (such as garbage collecting, incinerator operation, etc.).  For example, for four years at Raybrook – located far north in Essex County, New York – he worked on the snow-shoveling team.

Mr. Scott has also become a role model for his fellow inmates: "If I can help prevent another family from going through the ordeal me and my family went through from sharing my story and advice, I'll give them my best."  Exhibit D, Letter from Antonio Scott.  One of the men Mr. Scott was incarcerated with, Chad Marks, writes: I have personally witnessed him mentor younger guys from the New York area, and share his experiences with them in an effort to get them to appreciate their freedoms."  Exhibit E, Letters of Support.[16]  Mr. Marks writes: "I

---

[16] Mr. Marks, who was recently granted compassionate release, appeared on a CLE panel with Your Honor, titled "Winning a Non-Covid Based Compassionate Release Application," on January 12, 2021.

believe that Antonio Scott is a man that will succeed on the outside if given a second chance to reclaim his life." *Id.*

Upon his release, Mr. Scott hopes to pursue the myriad of interests he developed in BOP custody. He is interested in working as a CASAC drug counselor and continuing his training in electronics, which would enable him to become a microwave or TV technician. He is also interested in earning a commercial driver's license (CDL). Most importantly, Mr, Scott has people in the community who are determined to help him. His cousin, Dwight Lashley, writes: "He's been a very positive figure in my life and I want to return the favor and look out for my cousin when he gets home." *Id.* Specifically, Mr. Lashley has answered Mr. Scott's questions about obtaining a CDL and writes: "Greyhound paid for my CDL and I was actually able to put [Antonio] in contact with my supervisor at Greyhound." *Id.* Mr. Scott's friends write: "He never turned his back on me and I will not turn my back on him. I am going to assist him in anyway I can to make sure he gets back in the workforce," *id.* (Tanika Murray), and "I plan on providing both emotional and financial support for my friend once this case is over and he is able," *id.* (Craig Stokes).

The concrete skills Mr. Scott has already developed, coupled with his demonstrated work ethic and the support he will have, can give the Court confidence that Mr. Scott will re-enter the workforce, contribute to his community, and support his family upon his release. Mr. Scott's mother, Sheryl Hinkson, writes: "I know he has learned from his mistakes and just wants a second chance to prove to everyone that he is better." *Id.* Mr. Scott confirms this himself: "I am ready to be a father, son, husband and mentor to my mother, kids, wife and family." Exhibit D, Letter from Antonio Scott.

**C.      Other 3553(a) Factors Justify the Requested Sentence Reduction**

There is no question that Judge Baer intended to punish Mr. Scott with a substantial jail sentence for the serious crime he was convicted of at trial.[17]  But the time Mr. Scott has now served – more than 13 years in prison – has been more than sufficient to satisfy the statutory goals of sentencing.  18 U.S.C. § 3553(a).  As his cousin writes: "I know my cousin had to pay for his actions, and he has had time to reflect on who he is and where he wants to be years from now. His mindset and perspective has matured, and we hope that you will be able to give him a chance to work and be a positive role model for our family."  Exhibit E, Letters of Support (Dwight Lashley).

Thirteen years in prison is substantial punishment by any metric.  And that is particularly true when Mr. Scott's longest prior jail sentence was only 1-year long.  PSR ¶ 38.  This thirteen-fold increase has more than sufficiently punished and deterred Mr. Scott.  He writes: "I know I will be a productive member of society…due to the fact that I practice that in here."  Exhibit D, Letter from Antonio Scott.

It is also particularly true when over a year of his 13 imprisoned has been spent facing the COVID-19 pandemic.  *See* Section II, B, 3*, supra*.  As Judge Chin recently found:

> [S]hortening [the defendant's] sentence does not undermine the seriousness of the offense, or fail to respect the law, provide just punishment, or adequately deter criminal conduct. The frequent lockdowns at FCI Greenville have restricted [his] time outside his cell to approximately one hour per day and eliminated his access to all rehabilitation resources. To prolong [his] incarceration any further would be to impose a sentence reaching greater than the aims of his original sentence.

*Resto*, 2021 WL 1109467, at *3 (internal citations omitted).

---

[17] While Judge Baer found that the jury "had the wherewithal and indeed exercised their right to find that the government had proven the case beyond a reasonable doubt," he also stated that "[n]obody thinks that this guilty verdict that this jury came up with is free from doubt – well, the prosecutors may, but I don't."  Sent. Tr. 19.

If Mr. Scott's sentence of imprisonment is reduced to time served, the non-custodial portion of his sentence will commence.  On supervised release, Mr. Scott can reunite with his family at their new home in Dutchess County (and away from the neighborhood where Mr. Scott lived before his arrest for the instant case), work to support his family (utilizing the work ethic that has been on display while he has been in BOP custody and the skills that he has learned), and also receive the supportive and rehabilitative services of the U.S. Probation Department. Judge Baer already ordered that Mr. Scott receive drug treatment as part of his supervised release; that condition will ensure that Mr. Scott maintains his sobriety and does not repeat his past poor behavior.

If necessary, the Court could add a term of home confinement as a condition of Mr. Scott's early release, to ensure that the Probation Department can enforce more stringent conditions that would be an additional infringement on Mr. Scott's liberty and give the Probation Department increased ability to monitor his movements during his initial transition home.

### 1.    Mr. Scott is seeking a reduction of his sentence commensurate with other grants in this district

Mr. Scott has served 83 percent of his originally imposed term (of a substantial sentence of 207 months).  The length of time he has served, too, weighs in favor of a sentence reduction. As one court has noted:

> [C]ourts have found that compassionate release for defendants who have served the significant majority, at least two-thirds, of their sentences does not undermine sentencing goals. *See, e.g.*, *United States v. Van Praagh*, 14 Cr. 189 (PAC), 2020 WL 3892502, at *4 (S.D.N.Y. July 10, 2020). [The defendant here] has exceeded this threshold, having served over 85 percent of a harsh sentence.

*Clark*, 2021 WL 1066628, at *3; *see also United States v. Monzon*, 99 Cr. 157 (DLC), 2020 WL 4195272 (S.D.N.Y. June 2, 2020) (granting compassionate release after defendant had served 74 percent of his sentence); *United States v. Jasper*, 18 Cr. 390 (PAE), Dkt. No. 441 (S.D.N.Y. Apr.

6, 2020) (compassionate release granted after defendant served more than 70 percent of his sentence); *United States v. Fazio, Sr.*, 11 Cr. 873, Dkt. No. 329 (S.D.N.Y May 15, 2020) (74 percent); *United States v. Anderson*, 16 Cr. 824 (JMF), 2020 WL 2849483, at *1 (S.D.N.Y. June 2, 2020) (at least 66 percent); *United States v. Jones*, 15 Cr. 95 (AJN), Dkt. No. 2865 (S.D.N.Y. May 24, 2020) (66 percent); *United States v. Cooper*, 08 Cr. 356 (KMK), Dkt. No. 181 (S.D.N.Y. Apr. 28, 2020) ("nearly 75 percent"); *Resnick*, 2020 WL 1651508 ("61.7%").  Given the proportion of time Mr. Scott has already completed (83 percent), granting him compassionate release is appropriate.

## IV.    CONCLUSION

For the reasons described above, this Court should grant Mr. Scott's motion pursuant to 18 U.S.C. § 3582(c)(1)(A) and reduce his sentence to time served with home confinement and supervised release.

Respectfully submitted,

/s/
Sylvie Levine
*Counsel for Antonio Scott*